IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| GEORGE WASHINGTON UNIVERSITY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## VERIFIED COMPLAINT

COMES NOW John Doe[1], by and through his attorneys, Gregory S. Smith and Matthew G. Kaiser, and for his Complaint against George Washington University states as follows:

1.  John Doe has been suspended from George Washington University based on a finding that he committed sexual assault. This finding was made despite the fact that John Doe did not commit sexual assault, and after George Washington University found him in violation through a flawed process that did not comply with George Washington University's own procedures, that discriminates against men who are accused of sexual misconduct on the basis of their sex, and that was fundamentally unfair to John Doe.

2.  George Washington University's disciplinary process violated its own procedures and discriminated against John Doe by: (1) failing to define sexual assault in a manner that provided fair notice of its parameters, and was not unconstitutionally vague;

---

[1] "John Doe" is, obviously, not the plaintiff's real name. Due to the nature of the allegations in this lawsuit, Mr. Doe is proceeding in a way that will protect his privacy and that of his accuser.

(2) failing to interview key witnesses and collect vital evidence, as the school promised it would; (3) failing to notify John Doe's parents that a disciplinary violation was pending against him, contrary to the school's promises; (4) failing to compel a witness to attend John Doe's disciplinary hearing, as the school promised it would; (5) failing to allow John Doe to attend his disciplinary hearing in person, as the school promised he could; (6) failing to provide John Doe with a viable opportunity to to cross-examine the witness against him, as the school promised he could; (7) self-selecting just three members of the school's appeals committee set up to hear John Doe's appeal from his disciplinary hearing, in violation of the school's promises as to how appeals from disciplinary violations should be handled; and (8) failing to adequately consider substantial and powerful new evidence that shows that John Doe did not commit a sexual assault.

3. Because George Washington University failed to comply with its own stated policies for how disciplinary investigations, hearings and appeals should be handled – policies that formed the basis of the contract between John Doe and George Washington University – the school has breached its contract with John Doe.

4. George Washington University is a recipient of federal funding, and is not allowed to discriminate on the basis of sex in the way that it provides educational opportunities under Title IX of the Educational Amendments of 1972, codified at 20 U.S.C. § 1681. By establishing and implementing a system for resolving cases of sexual assault that substantially denies a student accused of sexual assault from meaningfully defending himself, George Washington University also violated Title IX.

5. George Washington University is also liable for negligence, negligent hiring, training, supervision and retention, and intentional infliction of emotional distress.

**PARTIES**

6. Plaintiff John Doe is, and at all times relevant to this Complaint has been, a resident of the State of New Jersey. John Doe is also a student who enrolled in his first year of undergraduate studies at George Washington University in the Fall of 2010.

7. Defendant George Washington University is a domestic non-profit corporation incorporated in, and with its principal place of business located in, the District of Columbia. Defendant George Washington University may be properly served by having a copy of this Verified Complaint and Summons delivered to its Registered Agent for Service of Process, Mary Lynn Reed, 2100 Pennsylvania Avenue, N.W., Suite 250, Washington, D.C. 20052.

**JURISDICTION AND VENUE**

8. The jurisdiction of this Court is properly invoked under 28 U.S.C. §§ 1331 and 1332. This is a civil action between citizens of different states, in which the amount in controversy exceeds $75,000.00, exclusive of interest and costs. This civil action also arises, in part, under the laws on the United States, including 20 U.S.C. § 1681, commonly known as Title IX.

9. Venue properly lies in this Court under 28 U.S.C. § 1391. The Defendant is incorporated in and has its principal place of business in the District of Columbia, and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within the District of Columbia.

## **THE CODE OF STUDENT CONDUCT**

10.     In the Fall of 2010, John Doe matriculated as a freshman at George Washington University.  Upon his enrollment, John Doe was provided with a student handbook by George Washington University.  A portion of that student handbook was the Code of Student Conduct, which established George Washington University's standards for acceptable conduct, and also described the procedures by which George Washington University would investigate and adjudicate any alleged violations of this student Code.

11.     In consideration for his tuition and attendance at George Washington University, John Doe received and was given assurances by George Washington University that they would follow and comply with numerous policies and procedures adopted and put forth by the school, including the Code of Student Conduct.

12.     The George Washington University Code of Student Conduct (hereinafter "the Code") prohibits certain conduct by students at George Washington University.  Specifically, the Code prohibits sexual assault, defined as "[i]nflicting any sexual invasion (including but not limited to sexual intercourse) upon any person without that person's consent.  'Consent' requires actual words or conduct indicating a freely given agreement to have sexual intercourse or participate in sexual activities."  This same Code provision also goes on to confusingly state, however, that, "depending on the particular circumstances, previous sexual relationships, the current relationship between the parties involved, or silence or lack of protest do not necessarily constitute consent."  By using this odd term "necessarily," the Code's definition means that there are, in fact, circumstances where "silence or lack of protest" will constitute consent.  The Code never

defines those situations. Instead, as noted, the Code says that it will simply "depend[] on the particular circumstances." Those circumstances are never defined.

13. The Code also establishes violations for the use of alcohol by students under 21 years of age, and disorderly conduct.

14. The Code also describes and establishes an Office of Student Judicial Services. This Office is within the Office of the Dean of Students and, by the terms of the Code, is charged with, among other things, "[i]nterviewing, advising, and assisting parties involved in disciplinary proceedings and arranging for a balanced presentation before the various judicial boards on a timely basis." By the plain language of the Code, the George Washington University's Office of Student Judicial Services is charged with assisting both the accused and an accusing student in the event of a disciplinary hearing.

15. The Code establishes a procedure for disciplinary hearings. Specifically, the Code requires that the Office of Student Judicial Services will take steps to compel the testimony of student witnesses who have relevant testimony. The Code provides that "[a]ll parties may question witnesses who testify for any of the parties at a hearing" and also that "the immediate parties . . . to the alleged violation may be present throughout the hearing."

16. The Code also provides an appeals process if a student is found in violation at a hearing. The standard in an appeal is whether there is "new information that is relevant to the case, that was not previously presented at the hearing or conference, and that significantly alters the finding of fact." The Code provides that appeals will be sent to the University's Committee on the Judicial System for review if the Senior Assistant Dean of Students determines that the appeal is viable. The Committee on the

Judicial System is "composed of the following members: two faculty members to be nominated by the Faculty Senate; two administrators to be nominated by the Dean of Students; and two full-time undergraduate students and one graduate student to be nominated by the President of the Student Association." The Code does not authorize review by panels, or exclusion of any member of the Committee from consideration of a given appeal, but merely provides that a quorum of the Committee on the Judicial System can exist if at least three members of the committee, including one member from each group represented on the Committee, are present.

## THE INCIDENT

17. On Thursday, October 28, 2010, Jane Roe, a first-year student at George Washington University, went drinking in Washington, D.C. In the early morning hours of October 29, 2010, Jane Roe returned to George Washington University and saw John Doe on campus.

18. Jane Roe approached John Doe and indicated that she would like to spend time with him. The couple went to John Doe's dormitory building. They first went to visit a mutual friend, James, and spoke with James and his roommates for a substantial amount of time.

19. According to James' roommates, while in James' room Jane Roe was physically affectionate with John Doe, repeating touching him on his arm, shoulder and thigh. Jane Roe was flirtatious with John Doe and James' male roommates, asking them how many women they had been with, boasting of her own sexual experiences, and making fun of their naïveté.

20. After a time, the couple decided they would go to John Doe's dormitory room. As they were leaving, James pulled Jane Roe aside, and spoke with her about her intentions toward John Doe. James reports that Jane Roe laughed, and asked James "Do you want me to fuck him?" before leaving to go upstairs to John Doe's room.

21. The couple arrived at John Doe's dorm room at approximately 3:00 a.m. John Doe has three roommates, who were awake, in the dorm room, and studying.

22. John Doe's roommates continued to study as John Doe and Jane Roe went to John Doe's bed. At one point, with the lights in the room still on, and the roommates still awake, they noticed that Jane Roe had stood and stripped down to her bra and underwear, before getting into John Doe's bed. The roommates sent each other a text message, even though they were all in the same room, noting that they were in an awkward position, because the woman that their roommate had brought back to their dorm room had just removed her clothing. The roommates discussed what they would do "if they start having sex." One roommate proposed that he would "face the wall and ignore this." The roommates ultimately decided to shut off the lights and go to sleep.

23. John Doe, following Jane Roe's lead, stripped down to his boxer shorts and got in bed. The couple then slept for a number of hours.

24. At some point around 5:00 a.m., Jane Roe woke up and began kissing John Doe. She began stroking his penis. She then rolled over, and removed her underwear, and positioned herself in a way to indicate that she wanted to have sex.

25. The couple began having sex. Near the conclusion, John Doe asked "where do you want me to cum"? Jane Roe said "Not inside me." John Doe then removed himself and ejaculated outside of Jane Roe.

7

26. The couple then slept for several more hours. At 9:00 a.m., one of the roommates' alarm clocks sounded, and Jane Roe woke. Realizing she was late to class, she grabbed her clothes and went into the bathroom as John Doe's roommates began to wake. After she was dressed and finished in the bathroom, she emerged, saw John Doe sitting up in bed, crossed the room and gave him a hug, before leaving.

27. Later, Jane Roe gave a statement to a George Washington University campus police officer. She was asked if she wanted to give a statement to the Metropolitan Police Department, and she said that she did not.

28. George Washington University's Office of Student Judicial Services started an investigation. The investigator assigned to the case, Emerald L. Christopher, interviewed Jane Roe. She then, later, interviewed John Doe. Though her obligation is not to build a case and develop charges, but, rather, to assist in "[i]nterviewing, advising, and assisting parties involved in disciplinary proceedings and arranging for a balanced presentation," Ms. Christopher did not interview James' roommates, who had seen the couple shortly before the incident, and did not thoroughly interview John Doe's roommates. In particular, Ms. Christopher did not seek or obtain the text messages exchanged between John Doe's roommates, which make it clear that Jane Roe personally removed her own clothing before getting into John Doe's bed.

29. Based on Ms. Christopher's incomplete, one-sided and conclusory investigation, George Washington University brought disciplinary charges against John Doe for a sexual assault on Jane Roe, an alcohol violation and disorderly conduct.

30. John Doe met with Ms. Christopher after he was charged. The purpose of the meeting was for Ms. Christopher to advise and assist John Doe in preparing for his

disciplinary hearing, by telling him about his rights that would exist at the hearing. When Ms. Christopher told John Doe that he had the right to compel any member of the campus community to testify on his behalf at the hearing, and that the Office of Student Judicial Services was responsible for compelling that testimony, John Doe told her that he wanted to compel James to testify.

31. Despite this request, Ms. Christopher did not compel the testimony of James. James was, ultimately, out of state, and unable to appear at the hearing to testify.

32. George Washignton University's public materials state that the University will contact the parents of a student who is under the legal drinking age and charged with an alcohol violation. At no time did George Washington University contact John Doe's parents after he was charged with an alcohol violation.

## THE HEARING

33. On the morning of the hearing, John Doe told Ms. Christopher that the witness he wanted to call was not going to be present. Ms. Christopher told John Doe that this fact did not matter, and the hearing would proceed without his witness.

34. The disciplinary panel ultimately heard only two witnesses, Jane Roe and John Doe. During Jane Roe's testimony, in violation of the Code, John Doe was not allowed in the hearing room, but, rather was kept in a separate room down a hallway with audio from the hearing piped in. John Doe was never able to see the testimony of Jane Roe, or the reactions to her testimony by the hearing officers who would decide his fate.

35. John Doe was not allowed to question Jane Roe. Instead, after Jane Roe's testimony, John Doe was told that he could not question Jane Roe himself, but that he must write down all of his questions, which a member of the hearing panel would then

9

ask of Jane Roe. Struggling to write down all of his desired questions in the limited window of time provided, John Doe pleaded with Ms. Christopher for additional to prepare these important questions, but he was told that the hearing had to resume, and he could not have the time he requested.

36. The members of the hearing panel then asked Jane Roe the questions written by John Doe, though the questions were incomplete and, in the opinion of the hearing panel members during the questioning, unclear. Indeed, at one point a member of the hearing panel was told by Jane Roe, during her cross examination, that she didn't understand the question. The hearing panel member said that he was unable to explain the question. Ultimately, the hearing panel spent only 12 minutes asking the questions John Doe had written.

37. Signifcantly, at the hearing, Jane Roe testified that she had never had any romantic interest in John Doe. She described their relationship as purely platonic, and specifically and adamantly denied that she had taken her clothes off before getting into John Doe's bed. She also denied ever kissing or touching John Doe that evening. Jane Roe acknowledged that she had not physically resisted John Doe, and that he had not overpowered her. Instead, she essentially claimed that she had been too drunk to consent to sex. She claimed that she woke up and realized that he was inside of her, describing his entry as being from behind. She described the sexual intercourse as then continuing without any movement or physical or verbal protest on her part, but without her consent.

38. Jane Roe was asked if she removed her own clothing before she entered John Doe's bed. She denied that she had taken off her own clothes, and was offended at the very idea: "I think about just undressing in front of like four guys and like

hopping into bed with one of them like, that's weird, gross." Pressed again in the hearing as to whether she might have simply forgotten or "blacked out," Jane Roe firmly rejected the idea that she removed her own clothing: "I just don't think I would do that, like it's just so like such an uncomfortable feeling, I'm like, the fact that there are like three other guys just hanging out, like watching me, like no."

39.     John Doe then testified at the hearing. He testified instead that, shortly before they went to sleep, with the lights in his room still on Jane Roe had stripped down to her bra and underwear, and gotten into bed with him. He further testified that before he and Jane Roe had sex, she had kissed him, stroked his penis, removed her underwear, and positioned herself in such a way as to indicate that she wanted to have sex with him.

40.     The disciplinary panel accepted Jane Roe's testimony and found John Doe in violation for sexual assault. He was suspended from George Washington for one year, with a notation on a transcript that he was found in violation of the George Washington Code of Student Conduct, he would be evicted from his dormitory room on campus, and he would lose his tuition and academic work for the Spring Semester of 2011.

## THE APPEAL

41.     When John Doe was found in violation and suspended, he told his family what happened. His parents retained undersigned counsel who began an investigation of the charges against John Doe. A lengthy appeal petition was shortly thereafter presented to George Washington University, based on new evidence that had been found.

42.     The new evidence included, among other things: (1) the results of a polygraph that John Doe took, verifying that he was telling the truth when he said that Jane Roe had kissed him, stroked his penis and removed her own underwear that night,

11

before they had sex, (2) contemporaneous text messages sent between John Doe's roommates within the room on the night of the incident, expressing surprise that Jane Roe had stood up and simply removed her clothing in front of them, with the roommates also commenting on the likelihood that sex might occur in the dorm room that night even though they remained present in the room, and (3) statements from numerous witnesses whom Ms. Christopher had failed to interview, who saw Jane Roe and John Doe shortly before they went to bed, and who described the couple as intimate and flirtatious, and describing Jane Roe, specifically, as constantly steering conversations toward sexually explicit topics.

43. The appeal was timely submitted. The Dean of Students determined that it should be forwarded to the Committee on the Judicial System for their review, verifying that the appeal was "deemed viable" under the student Code. However, rather than submit the appeal to the Committee on the Judicial System, as required by the Code, the Office of Student Judicial Services selected only three members of the Committee on the Judicial System and sent John Doe's appeal papers to those members alone. The other four members of the Committee on the Judicial System – comprising the majority – were not provided with this new information, or involved in the resolution of the appeal, in clear violation of the Code.

44. GWU's three self-selected members of the Committee on the Judicial System denied John Doe's appeal on March 31, 2011. On April 1, 2011, an official from the Office of Student Judicial Services informed John Doe that he would have to leave the campus by Sunday, April 10, 2011, at 5:00 p.m.

## COUNT I – BREACH OF CONTRACT

45. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

46. At all times relevant hereto, a contractual relationship existed between George Washington University and John Doe. George Washington University's Code of Student Conduct was deemed a part of that contract. Pursuant to that contract, George Washington University was required to act in accordance with its Student Code of Conduct in resolving complaints of violations of the student Code, in the investigation of those complaints, in the process of adjudicating the complaints before hearing boards, and in resolving appeals brought challenging a disciplinary panel's determination.

47. George Washington University breached this contract with John Doe by failing to comply with the student Code, a contract between John Doe and George Washington University, in at least the following ways:

   a. failing to provide fair notice of the parameters of charged offenses;
   b. failing to impartially investigate the allegations against John Doe;
   c. failing to notify John Doe's parents that he was charged with an alcohol related offense;
   d. failing to locate and preserve important relevant evidence which would have established that Jane Roe's testimony was false;
   e. failing to compel the testimony of a student witness who was identified by John Doe and whose testimony would have rebutted the claims of Jane Roe and supported the claims of John Doe;

  f. failing to allow John Doe to be physically present during most of the disciplinary hearing that was conducted against him;

  g. failing to allow John Doe to adequately cross-examine the witness against him; and

  h. failing to allow John Doe's appeal to be considered by the Committee on the Judicial System.

48. As a result of Defendant's breach, and as a direct and proximate cause thereof, Plaintiff has been seriously and irreparably damaged, including but not limited to the loss of his educational payments already made for 2011, loss of existing and future scholarship funds, loss of academic credit for educational course work already completed, deprivation of future educational opportunities, inhibition of his ability to transfer to other educational institutions, reputational damage, and loss of future earning capacity.

49. Accordingly, George Washington University is liable to John Doe for breach of contract, and all damages attendant thereto.

## COUNT II – VIOLATION OF TITLE IX

50. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

51. Defendant George Washington University violated Title IX in the manner in which it resolves allegations of sexual assault by students in general, and in the case of John Doe in particular.

52. George Washington University receives federal funding in the form of federal student loans given to students.

53. In virtually all cases of campus sexual assault, the accused student is male and the accusing student is female.

54. George Washington University, in the manner in which it approaches the investigation, adjudication, and appeal of allegations of sexual assault, creates an environment in which the accused is so fundamentally denied due process as to be virtually assured of a finding of guilt.  Such a biased and one-sided process deprives male students of educational opportunities on the basis of their sex.

55. John Doe, as a male student at George Washington University who has been subject to a school disciplinary action alleging a campus sexual assault, has been discriminated against by George Washington University on the basis of his sex, and in violation of Title IX.

56. As a result of Defendant's violation of Title IX, and as a direct and proximate cause thereof, Plaintiff has been seriously and irreparably damaged, including but not limited to the loss of his educational payments already made for 2011, loss of existing and future scholarship funds, loss of academic credit for educational course work already completed, deprivation of future educational opportunities, inhibition of his ability to transfer to other educational institutions, reputational damage, and loss of future earning capacity.

57. Accordingly, George Washington University is liable to John Doe for violation of Title IX, and all damages attendant thereto.

**COUNT III - NEGLIGENCE**

58. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

59. In its interactions with Plaintiff John Doe, in its adoption of a Code of Conduct, and in conducting its investigation and adjudication of John Doe's disciplinary proceedings, Defendant owed a duty to Plaintiff John Doe to exercise reasonable care, with due regard for the truth, established procedures, fair notice of the scope of any charged offenses, and the important and irreversible consequences of its actions, as well as the Plaintiffs' various liberty and property rights and interests generally.

60. Through their acts as set forth as set forth above, Defendant, acting through its agents, servants and/or employees, breached said duty by carelessly, improperly, and negligently performing their assigned duties, mischaracterized the truth, and facilitated a process that violated the rights and other protected interests of Plaintiffs.

61. As a direct and proximate result of Defendant's negligence, carelessness, and gross breach of due care, Plaintiff has and will suffer financial losses, including but not limited to the loss of his educational payments already made for 2011, loss of existing and future scholarship funds, loss of academic credit for educational course work already completed, deprivation of future educational opportunities, inhibition of his ability to transfer to other educational institutions, reputational damage, and loss of future earning capacity. As a further direct and proximate result of Defendants' negligence, carelessness and gross breach of due care, Plaintiff also has suffered and will continue to suffer from mental and emotional injuries, all of which are permanent in nature, for which compensation is warranted.

## COUNT IV – NEGLIGENT HIRING TRAINING SUPERVISION & RETENTION

62.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

63.   At said times and places, as set forth above, Defendant George Washington University, acting by and through its agents, servants and/or employees, had a continuing duty to reasonably, carefully, and conscientiously secure the services of qualified and well-trained agents, services and/or employees, and to reasonably hire, train, supervise and retain their agents, servants and/or employees, so as to reasonably assure, inter alia, that they were trained in reasonable methods of investigation and the need for timely collection and impartial evaluation of evidence, SJS's requirement to secure witnesses that parties seek to compel to attend disciplinary hearings, the need for disciplinary hearings to provide all basic rights to accused students guaranteed in the student Code, the need to provide a fair, impartial and complete appeals process, and the need to provide all other obligations as set forth in the student Code, and which GWU students have a right to expect.

64.   At said times and places, Defendant George Washington University, acting by and through its agents, servants and/or employees, breached these duties owed to Plaintiff John Doe.  The violations illustrate deliberate indifference manifested by systemic and grossly inadequate instruction, training, and lack of adequate supervision, control, discipline, and/or policies on the part of George Washington University.

65.   As a direct and proximate result of the aforesaid negligent hiring, training, supervision and retention by Defendant, Plaintiff has been injured as set forth above.

## COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

66. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

67. At said times and places, as set forth above, Defendant George Washington University, acting by and through its agents, servants and/or employees, did by extreme, outrageous, intentional, willful, malicious and/or reckless conduct, humiliate, embarrass, shock, and scar Plaintiff, as set forth above.

68. As a direct and proximate result of the aforementioned extreme, outrageous, intentional, willful, malicious and reckless conduct of Defendant George Washington University and its agents, servants and/or employees, Plaintiff suffered, and will continue to suffer, *inter alia*, severe emotional distress, mental anguish, embarrassment and humiliation, all of which are permanent in nature.

## PRAYER FOR RELIEF

**Wherefore,** Plaintiffs respectfully pray that this Court enter judgment on behalf of Plaintiff and against Defendant George Washington University, and order relief against the Defendant as follows:

a. That this Court issue a temporary restraining order, as well as preliminary and permanent injunctive relief, in favor of the Plaintiff, restraining Defendant George Washington University from suspending or otherwise punishing Plaintiff based on the finding of violation that resulted from the flawed disciplinary process in this case; and further requiring George Washington University to allow Plaintiff to complete his educational opportunities in accordance with his contract; and

b. That the Defendant be ordered to pay compensatory damages as appropriate to compensate Plaintiff John Doe for his losses caused by the Defendant's misconduct, in the amount of $1,000,000; and

c. That the Defendant be ordered to pay punitive damages, in the amount of $5,000,000; and

d. That this Court award Plaintiff his costs and expenses incurred in this action, as well as such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues herein presented.

Respectfully Submitted,

*/s/ Gregory S. Smith by MGK (Matthew Kaiser)*
Gregory S. Smith (D.C. Bar #472802)
Law Offices of Gregory S. Smith
913 East Capitol Street, S.E.
Washington, D.C. 20003
(202) 460-3381
(877) 809-9113 (Facsimile)
gregsmithlaw@verizon.net

*/s/*
Matthew G. Kaiser (D.C. Bar No. 486272)
The Kaiser Law Firm PLLC
910 17th Street NW
Suite 800
Washington, DC 20006
(202) 640-2850
(202) 280-1034 (Facsimile)
mkaiser@thekaiserlawfirm.com