IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RECEIVED

APR 20 2011

Clerk, U.S. District &
Courts for the District of Columbia
Bankruptcy

JOHN DOE,                           )
                                    )
    Plaintiff,                 )
                                    )
v.                                  )    Civil Action No. 11-CV-696 (RLW)
                                    )
GEORGE WASHINGTON UNIVERSITY,       )
                                    )
    Defendant.                 )
_____)

## GW'S OPPOSITION TO DOE'S MOTION FOR INTERIM INJUNCTIVE RELIEF

The George Washington University ("GW" or the "University") prohibits sexual assaults, which its "Code of Student Conduct" (the "Code") defines to include sex without consent. Consent, under the Code "requires actual words or conduct indicating a freely given agreement to have sexual intercourse, or to participate in sexual activities." And, the "degree of impairment of a person's ability to give or withhold consent (including but not limited to incapacity or helplessness caused by alcohol)" is germane to determining whether consent exists.

Jane Roe accused John Doe of having sex with her when she was too inebriated to give her consent. At the resulting disciplinary hearing, Doe admitted he had sex with Roe and that she was "obviously drunk" leading up to the incident. Accordingly, GW concluded that Doe violated its prohibition against sexual assault. And, it suspended him for a year.

Now, Doe has sued GW, purporting to allege claims for breach of contract, violation of Title IX, negligence, negligent hiring, training, supervision, and retention, and intentional infliction of emotional distress. He seeks $1,000,000 in compensatory damages and $5,000,000 in punitive damages. Plus, he has taken the extraordinary step of moving for interim injunctive

1

relief, so that he can remain at GW while his case is pending.[1]

But, Doe is unlikely to succeed on his case's merits. And he faces no irreparable harm if the Court denies his motion. The balance of the hardships with respect to Doe's motion favors GW. And, ordering his requested interim injunctive relief would greatly disserve the public interest.

In short, Doe's motion is meritless. So, the Court should dissolve the pending temporary restraining order and deny Doe's motion for a preliminary injunction.

## I.   FACTS

### A.   THE PARTIES

GW is a private university located in the District of Columbia.

Doe is a GW freshman, whom GW has suspended until the end of the Fall 2011 semester. Following a hearing conducted according to the procedures outlined in the Code, the University found that Doe sexually assaulted Roe, and also that he engaged in disorderly conduct in relation to the same incident.

### B.   GW'S GUIDE TO STUDENT RIGHTS AND RESPONSIBILITIES

Each academic year, GW publishes a "Guide to Student Rights and Responsibilities" (the "Guide") which contains, *inter alia*, the Code. The purpose of the Guide is to outline procedures, rights and safeguards that will promote an atmosphere conducive to teaching, learning, and the search for truth. To that end, the Code identifies behavior that GW prohibits, including sexual assault and disorderly conduct.

---

[1]     On April 8, 2011, Doe moved for a temporary restraining order and for a preliminary injunction. Later that day, this Court granted Doe's request for a temporary restraining order "pending a response from [GW]." And, on April 13, 2011, the Court consolidated further proceedings on Doe's motions and ordered that the temporary restraining order remain in place and that the parties maintain the status *quo* pending a decision on Doe's preliminary injunction motion or this Court's further order.

LDR/329425.3

The Code defines sexual assault to include sex absent express and knowing consent:

> Inflicting any sexual invasion (including but not limited to sexual intercourse) upon any person without that person's consent. 'Consent' requires actual words or conduct indicating a freely given agreement to have sexual intercourse, or to participate in sexual activities. The University community should be aware that, *depending on the particular circumstances,* previous sexual relationships, the current relationship between the persons involved, or silence or lack of protest do not necessarily constitute consent. Further, the degree of impairment of a person's ability to give or withhold consent (including but not limited to incapacity or helplessness caused by alcohol or other drugs) may be introduced as pertinent information at any University disciplinary hearing.

Pereira Dec. ¶ 6 (emphasis in original.) .[2]

The Code further recommends suspension for a year and eviction from GW residence halls or rental properties as the "minimum" sanction for students found to have committed that offense.  Pereira Dec. ¶ 6.

The Code also prohibits disorderly conduct, defined to include "acting in any manner that annoys, disturbs, threatens or harasses others; disrupting obstructing or interference with the activities of others; or behaving in a lewd or indecent manner." The Code recommends a minimum sanction of disciplinary probation and/or eviction from GW residence halls or rental properties as the sanction for violations.  Pereira Dec. ¶ 6.

The Code also prohibits possession and use of alcohol by persons under the age of 21, and recommends counseling for first time offenders.  Pereira Dec. ¶ 6.

The Guide also contains GW's "Procedural Guidelines" for handling disciplinary cases. Pereira Dec. ¶ 6.  Yet GW makes clear that the Guide is not to be read with the particularity of a criminal code.

> [T]he University realizes that the prevailing rule in matters of student **discipline must continue to be that of common sense, and an *excessive***

---

[2]     Citations to Assistant Dean Tara Pereira's Declaration are denominated "Pereira Dec. ¶ ___."

> *legalism can only disserve the University and its community of students, faculty, and staff.* The model for disciplinary procedures that the University adopts is that of the administrative process, *not* that of the criminal or civil courts.

Pereira Dec. ¶ 6 (emphasis added).

Several other provisions are to the same effect.

> The University disciplinary hearing system should not become excessively legalistic or adversarial. The hearing bodies may find it necessary frequently and firmly to remind parties, counsel, or advisers that the proceedings are *not* criminal or civil trials, that criminal or civil standards of due process and rules of evidence are *not* controlling, and that the hearing bodies shall enjoy *considerable discretion* to interpret, vary, and waive procedural requirements to the end that a just and fair decision may be obtained.

Pereira Dec. ¶ 6 (emphasis added).

> The purpose of a disciplinary proceeding is to establish the factual record of an alleged violation of the "Code". The procedures outlined do *not* attempt to recreate or approximate a court of law. Procedures shall reflect standards of fundamental fairness; however, minor deviation from procedural guidelines for hearings suggested in this "Code" shall *not* invalidate a decision or proceeding resulting from a conference or hearing unless significant prejudice to the accused or the University may result, as judged by the Assistant Dean of Students or designee.

Pereira Dec. ¶ 6 (emphasis added).

> The purpose of publishing disciplinary regulations is to inform students of prohibited behavior. This "Code" is *not* written with the specificity of a criminal statute, and any similarity to the language of any criminal statute does *not* mean that such language or statute or case(s) applies to the University's judicial system or is relevant to the interpretation or application of the "Code".

Pereira Dec. ¶ 6 (emphasis added).

> The University reserves the right to *modify or change requirements, rules,* and fees. Such regulations shall go into force *whenever* the proper authorities may determine. The right is reserved by the University to make changes in programs without notice whenever circumstances warrant such changes.

Pereira Dec. ¶ 6 (emphasis added).

4

LDR/329425.3

> Formal rules of evidence will *not* be applicable to disciplinary proceedings described in this "Code".

Pereira Dec. ¶ 6 (emphasis added).

> Notarized affidavits *may be accepted* or other accommodations made at the discretion of the presiding officer *in lieu of live testimony* if a witness is out of state or otherwise determined to be unavailable.

Pereira Dec. ¶ 6 (emphasis added).

### C.   GW's DECISION TO SUSPEND DOE

#### 1.   GW's Office of Student Judicial Services

GW's Office of Student Judicial Services ("SJS") handles student disciplinary matters. Among other things, it (1) determines the disciplinary charges to be filed against the alleged wrongdoer; (2) interviews, advises, and assists the involved parties; and (3) arranges for a balanced presentation before GW's various judicial boards.

SJS adjudicates about 1,100 cases per year.  Pereira Dec. ¶ 5.

Assistant Dean of Students Tara Pereira oversees SJS.  She is and experienced professional who has had that responsibility for nearly ten years.  Pereira Dec. ¶ 4.

Assistant Director Emerald Christopher is the primary case manager for incidents involving sexual assault.  She too is an experienced professional who has served as Assistant Director of SJS since November 2007.  She serves on GW's Sexual Assault Task Force.  And she coordinates and supervises training for GW's Sexual Assault Crisis Consultation Team on University Judicial Procedures.  Christopher Dec. ¶ 3-4.[3]

#### 2.   Jane Roe's Complaint and SJS's Investigation

On November 22, 2010, Jane Roe told Assistant Dean Pereira that Roe wished to file a

---

[3]     Citations to Assistant Director Emerald Christopher's Declaration are denominated "Christopher Dec. ¶ ___."

disciplinary complaint against Doe for sexually assaulting her on October 28, 2010.  Dean

Pereira assigned the matter to Assistant Director Christopher, who interviewed Roe on

November 25 and 30, 2010.  Christopher Dec. ¶ 5.

In brief, Roe reported that on October 28, 2010, she drank heavily -- several shots of

tequila, a bottle of wine, three glasses of champagne, and three shots of a drink that she could not

recall -- before her encounter with Doe.  At about 2:00 or 3:00 a.m., Roe reported, they went to

his room, where she blacked out on his bed.  Christopher Dec. ¶ 7.

When she awoke, she was lying in Doe's bed with him next to her.  He asked if they

could go to her room to have sex in private.  Roe said no.  And, believing the issue to be closed,

she rolled onto her side.  Christopher Dec. ¶ 7.

Roe next remembered waking up to find Doe having sex with her.  She was "confused

because it was dark and quiet" when she awoke.  Roe was "discombobulated about where [she]

was," "in shock, and frozen trying to figure out what was happening."  Christopher Dec. ¶ 7.

Roe thought about Doe's roommates, who were present, and she was "really

embarrassed."  She "stayed quiet because she "didn't want them to know what was happening."

Christopher Dec. ¶ 7.

Doe asked "where do you want me to [ejaculate]?"  Roe responded, "Not in me."  He

said, "yeah, exactly" and withdrew.  Christopher Dec. ¶ 7.

Roe was speechless.  Then she fell asleep again.  Christopher Dec. ¶ 7.

When Roe next awoke, at about 9:00 a.m., she was wearing only her bra and underwear.

But, she did not remember undressing herself.  Christopher Dec. ¶ 7.

Roe was "weirded out."  Christopher Dec. ¶ 7.  She went to the bathroom and could tell

that she was still drunk because she was "stumbling and tripping."  She then left the bathroom,

collected her shoes, money, and identification, and left.  Christopher Dec. ¶ 7.

Roe told Assistant Director Christopher that, if SJS held a hearing on her complaint, Roe did not wish to be in the same room with Doe and preferred for him to question her from another location by proxy.  SJS offers those options to alleged victims of violence and sexual assault. Christopher Dec. ¶ 7.

Assistant Director Christopher next interviewed Doe.  Christopher Dec. ¶ 8.  In brief, he reported that he drank heavily — eight or nine beers — before he encountered Roe.

They went to his room.  And, because his roommates were present and Roe "looked like she wanted to do something (in a sexual way)" he asked her "if she wanted to go to her room." Christopher Dec. ¶ 8.

Doe reported "[Roe] said no, because she had an early class on main campus and that she would wake up early when [Doe's] roommates were gone or still asleep and go into the shower with him."  Then she "took her clothes off" and got into the bed with him.  Christopher Dec. ¶ 8.

"At around 6:00 in the morning, they started making out.  One thing led to another and [they] started having intercourse."  Christopher Dec. ¶ 8.

According to Doe, Roe "did not stop it in any way, instead she helped the situation."  Roe "was the one who pulled down her panties and moved closer."  Also, she "pulled down [Doe's] boxers."  Christopher Dec. ¶ 8.  Roe did not "seem sour at all in the morning."  Instead, it seemed like she was ready to leave but nothing that wasn't normal."  Christopher Dec. ¶ 8.

At Roe's suggestion, Assistant Director Christopher interviewed students who were with her before or after the alleged assault.  But none of them witnessed it.  Christopher Dec. ¶ 8.

At Doe's suggestion, Assistant Director Christopher interviewed a friend – ███████ – with whom Doe and Roe spent time before the alleged assault.  Also, at Doe's suggestion, she

7

interviewed two of his three roommates.[4]  But, like the individuals who Roe identified, Doe's witnesses did not see the alleged assault.  Christopher Dec. ¶ 9.

Doe's two roommates reported to Assistant Director Christopher that they exchanged contemporaneous text messages confirming that Roe had undressed herself before climbing into Doe's bed.  They said that they would forward the messages to Assistant Director Christopher.  But she never received them.  Christopher Dec. ¶ 12.

In all, Assistant Director Christopher interviewed seven witnesses: Roe, Doe and the individuals whom they identified.  With each, she followed the normal practice of memorializing what was said.

- She typed as the witness spoke.

- Then she printed what she typed and asked the witness to review and revise the statement as he or she wished.

- And, once he or she was satisfied that the statement was accurate and complete, Assistant Director Christopher asked the witness to sign and date it.

Christopher Dec. ¶ 13.

### 3.  The No Contact Order

On December 9, 2010, Assistant Christopher directed Roe and Doe to have no contact with each other.  SJS routinely issues such directives as an interim measure when violence or a sexual assault is alleged.  Christopher Dec. ¶ 14.

### 4.  The Charge

Assistant Director Christopher presented the evidence to Assistant Dean Pereira.  And, after considering it carefully, Assistant Dean Pereira decided to charge Doe with three violations: (1) sexual assault; (2) disorderly conduct; and (3) possession or use of alcohol by persons under

---

[4]      She also tried to interview Doe's third roommate.  But he would not cooperate.

LDR/329425.3

21.  Pereira Dec. ¶ 8.  Also, she set the matter for a February 4, 2011, hearing before a University

Hearing Board.  Pereira Dec. ¶ 8.

### 5.  Assistant Director Christopher's Pre-Hearing Meeting with Doe

On January 28, 2011, Assistant Director Christopher met Doe for a pre-hearing

conference.  During it, she gave him the official charge letter, gave him copies of the statements

that she had collected from the individuals she had interviewed, and summarized SJS's

procedure for adjudicating charges.  Among other things:

- She told him that, at the hearing, he and Doe would be separated from one another and he would question Doe by proxy.

- She asked if he planned to have an advisor at the hearing.  He said no.

- She asked him to sign a release so that she could speak with his parents.  He said no.

- She encouraged him to contact his parents.  He said that he would await the hearing's outcome.

- And, she recommended that, before the hearing, he prepare any questions for Roe that he could anticipate.

Christopher Dec. ¶ 15.

On February 3, 2011, she called Doe and asked if he planned to bring witnesses.  He said

that he would bring ▮▮▮.  Christopher Dec. ¶ 16.

### 6.  The Hearing

The hearing commenced on February 4, 2011, as scheduled.  Doe arrived without ▮▮▮

and told Assistant Director Christopher that ▮▮▮ was out of town.  Yet, since the Hearing

Board had ▮▮▮ statement, since Assistant Director Christopher had taken it, Doe said that he

was not opposed to proceeding without him.  Doe also said that his friend would be his advisor.

Christopher Dec. ¶ 17-18.

Doe — the accused in the disciplinary proceeding and the Plaintiff in this action — sat in

LDR/329425.3

the conference room with the Hearing Board during the hearing's initial phase.  Roe — the complainant in the disciplinary proceeding — sat in a separate room, and participated by telephone.  Christopher Dec. ¶ 20.

During the initial phase, the participants introduced themselves and the Hearing Board Chairman summarized the proceeding, read the charges, and asked Doe to state whether, as to each, he pled in violation or not in violation.  Christopher Dec. ¶ 21.  Doe pled in violation to the alcohol charge.  But, he pled not in violation to the sexual assault and disorderly conduct charges.  Christopher Dec. ¶ 21.

When the initial phase concluded, Doe and Roe essentially switched places.  Doe left the conference room and went to a separate room, where he could hear the proceedings by telephone.  And, Roe entered the conference room so the Hearing Board members could question her.  Christopher Dec. ¶ 22.

The Hearing Board members questioned Roe about the charges.  Then they took a break for approximately thirty minutes to give Doe an additional opportunity to prepare his cross examination.  Christopher Dec. ¶ 23.

After the break, the Chairman cross-examined Roe with the questions that Doe had prepared.  He also invited Doe to clarify anything that Roe could not understand.  And, he allowed Doe to prepare follow-up questions, which the Chairman put to Roe.  Christopher Dec. ¶ 24.  When Doe said that he had no more questions, the Hearing Board excused Roe.

Doe then returned to the hearing room.  The Board questioned him about the charges. Doe said that he did not know everything that Roe had to drink.  But, he admitted, repeatedly, that he knew that Roe was drunk leading up to their sexual encounter.

> I just overall, like I, *she was obviously drunk*, I didn't know she
> drank that much, she just said that she had shots of tequila, I didn't

know that she had Everclear, which is apparently in one of the statements, I didn't know that she had a whole bottle of wine. I didn't know that she had champagne; she just said she had shots of Everclear. I was not aware of how drunk she was, and if I had known, I guess things would have turned out differently because *she was obviously very drunk* but because I also knew how drunk I was, I was not aware of it.

Tr. 73:12 – 74:1 (emphasis added) (Transcript attached s Exhibit E to Pereira Declaration).[5]

She like, yeah, *she seemed drunk* and I was drunk too, so that's why it was totally acceptable for her to seem that way.

Tr. 75:16-18.

Q     In the course of your conversation did she ever mention how much she had drunk at all.

A     She just said she had shots of tequila, she did not say how many, she did not say she had any of the other drinks that she listed in her statement either.

Q     And then when you were at [Name Redacted]'s room I think that you said she had two beers?

A     Yeah.

Q     Now did you see her actually drink them or did you just —

A     I saw her drink them and [Name Redacted] saw her drink them.

Tr. 78:14 – 79:6.

I would just like to say, *we were both drinking*, we made stupid mistakes, and obviously it's definitely a lessoned learned but because we were both drinking I do not think I should be convicted of these charges.

Tr. 97:7-11.

Based upon the evidence of Roe's impaired condition, the Hearing Board concluded that

it is more likely than not that Doe had violated GW's prohibition against sexual assault and

---

5       Everclear is a potent spirituous beverage, from 75.5% to 95% alcohol by volume. *See* http://www.luxco.com/public/brands/specs/specification.asp?brandid=21 (last visited April 20, 2011).

disorderly conduct.

Thus, as to the sexual assault charge, the Board found as follows:

> The Board finds that based on [Roe's] statements of where she described herself as being in an intoxicated state from her alcohol consumption, having passed out in [Doe's] bed, [Roe] was not in a physical or mental state where she was able to knowingly provide consent for sexual activity with [Doe].  Therefore, based on the information presented in the case materials and the statements of [Doe] and [Roe] the Board finds that there is a preponderance of the evidence that indicates [Doe] inflicted a sexual invasion on [Roe] on the night of the incident without her consent, *given her incapacity to give consent due to her degree of impairment*.  As such, the Board finds [Doe] in violation of this charge.

Pereira Dec. ¶ ___ (emphasis added).

Likewise, as to the disorderly conduct charge, the Board found as follows:

> The Board finds [Doe] in violation.  [Roe] stated that she passed out in [Doe's] bed on the night of the incident due to her level of intoxication.  [Roe] stated that when she began to wake up, she realized that [Roe] was having sexual intercourse with her.  [Roe] stated when this was occurring she was 'paralyzed' and 'frozen.' [Roe] stated that she did not verbally or physically give consent to have sexual intercourse with [Roe].  [Doe] stated that at no time did [Roe] say 'no' or attempt to push him away during sexual intercourse.  Based on [Doe]'s statement, [Roe]'s statement, and the information provided in the case materials, the Board finds it more likely than not that [Doe] behaved in a lewd or indecent manner for engaging in sexual activity with [Roe] *while her ability to give consent was impaired due to her degree of intoxication*. Therefore, [Doe] is in violation of this charge.

Pereira Dec. ¶ 9 (emphasis added).

As a sanction, the Board recommended suspension for a year, the minimum sanction that

the Code recommends for sexual assault.   Pereira Dec. ¶ 9.[6]

---

[6]      Under the Code, suspension entails "[e]xclusion from classes and other privileges or activities, including access to University premises or University-sponsored activities off campus, as set forth in the notice of suspension, for a specified period of time." Also, "any student who is suspended shall not be entitled to any tuition or fee refund and is barred from University premises." Pereira Dec. ¶ 8.

(footnote continued on next page)

12

### 7.  The Disciplinary Sanction

In keeping with the Guide, Peter Konwerski, GW's Senior Associate Vice President and Dean of Students, next took up the matter.  After considering everything presented at the hearing and the documentation contained in Doe's file, Vice President Kownwerski concurred with the Board's findings and the sanction it had recommended.

Thus, on behalf of GW, Dean Konwerski suspended Doe from the University until the end of the Fall 2011 semester.  Pereira Dec. ¶ 10.

Also, on February 17th, Doe authorized GW to release information to his parents. Christopher Dec. ¶ 27.

### 8.  Doe's Appeal

Disappointed students may appeal adverse disciplinary decisions based on "new information that is relevant to the case, that was not previously presented at the hearing … and that significantly alters the finding of fact.  Pereira Dec. ¶ 6.  Under the Guidelines, the Senior Assistant Dean of Students first reviews the appeal.  If she determines that it meets the requirements for appeal and has "viability," she forwards it to Committee on Judicial Systems for final review on the merits.  Pereira Dec. ¶ 6.  That Committee, in turn, has three options: (1) affirm the original hearing board's findings; (2) remand the case to that Board for a new hearing; or (3) request that a new Board hear the case.  Pereira Dec. ¶ 6.

The Committee consists of seven members: two faculty members, two administrators, two full time undergraduate students, and one graduate student.  Under the Guide, however, a quorum consists of three members, with one from each constituency — administrators, faculty,

---

13

and students — represented.  And, for nearly 10 years, GW's practice has been to delegate the appeal to a three-member panel of the Committee chosen by Assistant Dean Pereira.  Pereira Dec. ¶ 11.

Doe appealed his suspension on March 4, 2011.  On March 22, 2011, the Senior Assistant Dean of Students determined that Doe met the requirements for appeal.  So, she forwarded it to the Committee on Judicial System for review.  Pereira Dec. ¶ 15.  Consistent with long-standing practice, Assistant Dean Pereira selected three Committee members to consider the appeal – one faculty member, one staff member and an undergraduate student.  And, she was confident that the Committee would do so fairly.

The Committee members carefully reviewed Doe's appeal, the charges, the investigation documents, and the Hearing Board's Adjudication Report.  They also listened to the audio tape of the hearing.  And they met, on March 31, 2011, to deliberate.

They decided, unanimously, that there was "not sufficient cause for remanding the case to the original Hearing Board or a newly appointed Hearing Board or a newly appointed Hearing Board."  Thus, the Committee affirmed the disciplinary action against Doe.

This litigation ensued.

## II.   ARGUMENT

### A.   DOE CANNOT SATISFY THE REQUIREMENTS FOR OBTAINING INTERIM INJUNCTIVE RELIEF.

#### 1.   The Standard for Assessing Motions for Interim Injunctive Relief

Interim injunctive relief is an extraordinary measure that courts should be chary about granting.  "It is an extraordinary form of interim relief, however, and 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Shelley v. Amer. Postal Workers Union*, No. 11-0677, ___ F. Supp. 2d ___, 2011 WL 1334313, at *2 (D.D.C.

14

Apr. 8, 2011) (citing cases).

To carry his burden, the movant must prove that (1) there is a substantial likelihood that he will prevail on the merits; (2) he will suffer irreparable harm if the Court denies the motion; (3) his alleged harm outweighs the harm GWU will suffer if the Court denies the motion; and (4) ordering the injunction will not disserve the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 129 S. Ct. 365, 374 (2008); *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958); *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011).

Doe fails as to each element.

**B.    DOE'S ALLEGED INJURY — LOSS OF THIS SEMESTER'S WORK AND DELAY UNTIL JANUARY 2012 IN RESUMING HIS EDUCATION AT GW — IS NOT IRREPARABLE.**

The most important inquiry is whether the movant will suffer irreparable injury without the requested injunction.

> A movant must, at a minimum, 'demonstrate that irreparable injury is *likely* in the absence of an injunction,'. . . . Indeed, because 'the basis of injunctive relief in the federal courts has always been irreparable harm,' a movant's failure to establish irreparable harm is grounds for denying a motion for preliminary injunction without considering the other factors.

*Bill Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331, 334-35 (D.D.C. 2009) (citation omitted) (emphasis in original).

The District of Columbia Circuit has set "a high standard" to establish irreparable harm. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

> First, the injury 'must be both certain and great; it must be actual and not theoretical.' . . . The moving party must show '[t]he injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'. . . Second, the asserted injury must be beyond remediation. As stated by the D.C. Circuit: Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay[,] are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later

date, in the ordinary course of litigation[,] weighs heavily against a claim of irreparable harm.

*Bill Barrett Corp.*, 601 F. Supp. 2d at 335 (citations omitted) (emphasis in original).

Like time and energy, neither embarrassment nor inconvenience constitutes irreparable harm. *District 50, UMW v. Int'l Union, UMW*, 412 F.2d 165, 167 (D.C. Cir. 1969).

Doe contends that without interim injunctive relief, he will be unable to complete this semester at GW, "[n]o final scores will be earned … and he will be required to repeat each of [his] courses." Memorandum of Law in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction ("Doe's Br."), at 24. That is not irreparable harm.

To the extent Doe has rights in connection with the disciplinary proceedings conducted or his charges, they are contractual in nature. *See Basch v. George Washington Univ.,* 370 A.2d 1364, 1366 (D.C. 1977) ("the relationship between a university and its students is contractual in nature"). *See also Greenya v. George Washington Univ.,* 512 F.2d 556, 562 (D.C. Cir. 1975) (GW "must…be viewed as a private institution" and therefore teachers and students "can have no claims for relief against the University or its employees arising under the…procedural due process guarantees of the Fifth Amendment").

The ruling in *Ben-Yonatan v. Concordia Coll. Corp.,* 863 F. Supp. 983(D. Minn. 1994), is instructive.

Concordia suspended Ben-Yonatan for a year. Thereafter, she sued for breach of contract and moved for an order enjoining the suspension until the litigation concluded. Without the injunction, Ben-Yonatan argued, she would be unable to complete her undergraduate education and enter medical school on schedule. That, in turn, would postpone the day on which she would become a doctor. The Court, however, denied her motion because she faced no irreparable harm.

> Ben-Yonatan argues that she will suffer irreparable harm if she is denied the opportunity to complete her undergraduate education at Concordia

16

College by May 1995. Ben-Yonatan asserts that, due to her inability to complete her undergraduate degree in May 1995, she will be unable to enter medical school in the fall of 1995 and, consequently, will lose at least one year of compensation as a medical doctor. . . .

The harm Ben-Yonatan alleges is the loss of one year compensation as a medical doctor, a harm which is clearly compensable by monetary damages.

*Id.* at 986.

Numerous cases are to the same effect. *See Stockstill v. Quinnipiac Univ.,* No. 3:10-cv-265, 2010 WL 2011152, at *5 (D. Conn. May 19, 2010) (dismissed student suffered no irreparable injury despite contention that without injunction "he will fall behind his peers both academically and financially, impeding his academic career and eventual entry into the workforce and limiting his future educational endeavors and earning capacity"); *Bilut v. Northwestern Univ.,* 645 N.E.2d 536, 541-42 (Ill. App. Ct. 1994), *appeal den.,* 649 N.E.2d 413 (Ill. 1995) (because money damages are available, "former student of a private school who claims an entitlement to readmission may not obtain equitable relief in the form of a mandatory order for readmission"); *Boehm v. Univ. of Pa. Sch. of Veterinary Med.,* 573 A.2d 575, 586 (Pa. Super. Ct. 1990) ("An injury is deemed irreparable if it cannot be adequately compensated by an award of damages. . . . [D]elay in the student's education ... would not prevent him from completing the educational process ... [and] [i]f there should be damages ... they could be compensated adequately by monetary damages") (citations omitted); *Schulman v. Franklin and Marshall Coll.,* 538 A.2d 49, 52 (Pa. Super. Ct. 1988) ("The time lost by the student during class has already been lost and can never be regained. The relief for such time lost, if on the merits the appellant should prevail, would be money damages."); *Law v. Rice Univ.,* 123 S.W.3d 786, 794 (Tex. Ct. App. 2003) (lost post-graduation job opportunity and one-year delay in graduation with concomitant lost earnings not irreparable because "[s]uch harm ... can be compensated by

17

monetary damages").[7]

Doe's motion for interim injunctive relief warrants the same treatment.   He contends that without an injunction, he will lose a semester's work and be delayed in completing his education. Doe's Br. at 24.   But, as a matter of law, this alleged loss is not irreparable.

So, the Court should dissolve the pending temporary restraining order and deny his motion for preliminary injunctive relief.

## C.   DOE IS UNLIKELY TO PREVAIL ON THE MERITS OF HIS CASE.

### 1.   Doe's Contract Claim

In Count I of his Complaint, Doe contends that GW breached its alleged contract with him by not strictly adhering to its disciplinary procedures.   He is wrong.

To the contrary, the evidence establishes that GW substantially complied with its disciplinary procedures.   So, even assuming that those procedures are contractual, which GW does not concede, Doe's contract claim is doomed.

### a.   At most, a private college or university need only substantially comply with its disciplinary procedures.

GWU assumes only for purposes of Doe's motion that its disciplinary procedures are part of a "contract" between the University and its students.   *Basch v. George Washington University*, 370 A.2d 1364, 1366-67 (terms in University Bulletin become part of contract between institution and its students).   *Accord Pride v. Howard Univ.*, 384 A.2d 31, 34 (D.C. 1978) (university code of conduct assumed to be part of contract between university and students).

---

[7]   *Coulter v. East Stroudsburg Univ.* No. 3:10-CV-877, 2010 WL 1816632 (M.D. Pa. May 5, 2010), contributes nothing to Doe's case.   Indeed, the *Coulter* court's reasoning on irreparable harm is thin, without citation, and never mentions possible money damages.   Nor does it distinguish, or even mention, the long line of cases, see pp. 15 - 17, *supra*, that hold that damages are available to remedy the types of injury that Doe has alleged.

18

Courts, however, have warned against rigidly applying contract principles in the university setting. Instead, "the standard is that of reasonable expectation, what meaning the party making the manifestation, the University, should reasonably expect the other party to give it." *Giles v. Howard Univ.,* 428 F. Supp. 603, 605 (D.D.C. 1977). And, that standard is "deferential." *Doherty v. S. Coll. of Optometry,* 862 F.2d 570, 577 (6th Cir. 1988).

The District of Columbia Court of Appeals put the matter this way:

> [W]e should be reluctant to construe the rules and procedures of a private university, particularly in the instant case where the University Senate Council is empowered to entertain and adopt modifications to the System of Judiciaries and Code of Conduct. Our reluctance stems from an appreciation both of the autonomous role universities have historically enjoyed regarding their own governance and considerations relevant to academic freedom.

*Pride*, 384 A.2d at 34 n.2.

Likewise, that Court has admonished that:

> [c]ontracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is. The readings of the market place are not invariably apt in this non-commercial context.

*Id.* at 35 (quoting *Greene v. Howard Univ.*, 412 F.2d 1128, 1135 (D.C. Cir. 1969). *Accord Harwood v. Johns Hopkins Univ.*, 747 A.2d 205, 209 (Md. App. 2000);[8] *Napolitano v. Trs. of Princeton Univ.*, 453 A.2d 263, 272-73 (N.J. App. 1982).[9]

---

[8]    Holding:

> School discipline is not an area in which courts lay claim to any expertise. Consequently, courts will not generally interfere in the operations of colleges and universities. Courts must enter the realm of school discipline with caution and allow schools flexibility in establishing and enforcing disciplinary procedures.

[9]    Holding:

> The student comes to the academic community (the university) seeking to be educated in a given discipline. The student pays a tuition which might, in some

(footnote continued on next page)

19

Consistent with those principles, courts have made clear that, at most, universities need only substantially comply with their disciplinary regulations. *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 381 (Mass. 2000);[10] *Clayton v. Trs. of Princeton Univ.*, 608 F. Supp. 413, 419 (D.N.J. 1985) (no breach of contract occurred since university's departure from its procedures was not "substantial and material"); *Napolitano*, 453 A.2d at 270 ("The principal issue, as we see it, is whether the trial judge properly viewed his role as limited to a determination of whether Princeton substantially complied with its own regulations in disciplining plaintiff .").[11]

---

instances, represent a contractual consideration. The university undertakes to educate that student through its faculty and through the association of other students with that student and the faculty. Transcending that bare relationship is the understanding that the student will abide by the reasonable regulations, both academic and disciplinary, that the student will meet the academic standards established by the faculty and that the university, on the successful completion of studies, will award the degree sought to the student. Such a relationship, we submit, cannot be described either in pure contractual or associational terms. In those instances where courts have dealt with the relationship of a private university to its students in contractual terms, they have warned against a rigid application of the law of contracts to students' disciplinary proceedings.

[10] Holding:

We adhere to the principle that '[c]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities.' ... A university is not required to adhere to the standards of due process guaranteed to criminal defendants or to abide by rules of evidence adopted by courts. 'A college must have broad discretion in determining appropriate sanctions for violations of its policies.'

[11] Moreover a university need not even go that far when a student admits the alleged wrongdoing.

A contract between an educational institution and a student is only enforceable so long as the student complies with the college's rules and regulations. Therefore, even if Centre had guaranteed Trzop's due process, such was rendered unenforceable after Trzop failed to comply with Centre's rules. When Trzop intentionally possessed a knife in violation of Centre's express prohibition, he breached his contract with Centre and therefore excused any further performance on the college's behalf.

Further, there is no absolute right to due process in a private college's disciplinary action when the student admits the charges necessary to justify his punishment. In the instant case, Trzop acknowledged ownership of the survival knife. This admitted violation of the applicable Student Handbook and Catalog justified his immediate dismissal from the college. In fact, *where a student*

(footnote continued on next page)

20

*Pride* illustrates how those principles apply in the District of Columbia.

Howard University suspended Pride for one year after a Judiciary Board hearing. Pride sued for breach of contract, claiming that (1) only six Judiciary Board heard his appeal, not the eight identified in Howard's Code of Conduct; and (2) less than a majority of the Board had voted to convict him.

The District of Columbia Superior Court rejected Pride's claim, and the Court of Appeals affirmed. The Court of Appeals observed that Howard's Code of Conduct does not purport to establish university disciplinary procedures with the particularity of a criminal code. And, Howard had been true to its normal hearing practice, which constitutes part of its contract with its students.

> A fair reading of the record reflects that the University's practice was not to replace Board members who had graduated until the following fall term. This practice was in effect at the time the 'contract' between appellant and appellee was formed. . . . It has been established that *the usual practices surrounding a contractual relationship can themselves be raised to the level of a contractual obligation.*
>
> [W]e conclude in the instant case that the usual disciplinary procedure and practice of the Judiciary Board in effect at the time of the formation of the contract between Howard University and appellant . . . effectively constituted a part of their agreement.

384 A.2d at 34-35 (citations omitted) (emphasis added).

Doe's contract claim against GW fares no better. Doe finds fault with GW for (purportedly) vaguely defining sexual assault, not investigating the allegations against him as thoroughly as he would like, not telling his parents about the charges against him, not locating

---

> admits the charges against him, there is no need to conduct further hearings or allow the student an opportunity to explain or to present his own version of the facts.

*Centre Coll. v. Trzop*, 127 S.W.3d 562, 568 (Ky. 2004) (citations omitted, emphasis added).

21

and preserving physical evidence, not compelling ▮▮▮ to testify at the Hearing Board hearing,

separating Doe and Roe at the hearing, requiring Doe to cross examine Roe by proxy, and

delegating his appeal to three members of the Committee on Judicial Systems. In essence, he

would have this Court hold GW to the standard of a prosecutor handing a criminal matter.

Doe, however, points to anything that suggests that GW reasonably expected students to

believe that GW would handle disciplinary actions in that manner. Indeed, the opposite is true.

GW makes clear in the Guide that disciplinary proceedings "are *not* criminal or civil trials, that

criminal or civil standards of due process and rules of evidence are *not* controlling."

Moreover, Doe does not, and cannot, point to anything in the Guide or Code that requires

GW to notify parents when a student faces disciplinary charges. He relies, instead, on the

following question and answer on SJS's Web site:

> *I pay the bills; I want to know what is going on. Why can't SJS tell me the details of my student's case?*
>
> The federal Family Educational Rights and Privacy Act of 1974 (FERPA) prohibits educational institutions from disclosing information from a student's educational record to any third party **including parents** without the student's consent. This law was enacted partly as a reaction to the outcries of the "baby boom" generation in the wake of the turbulent times during the Vietnam War. Because Congress was displeased that colleges and universities were sharing information with parents, the government, and the media – information students believed should be confidential – lawmakers extended federal privacy protection to all educational records.
>
> The University strictly adheres to the provisions in FERPA, but there are exceptions in the law. Parents of a student under 21 years of age **may** be notified by the University if their student is involved in an alcohol-related or drug-related disciplinary case. Even with these provisions, the best way to ensure SJS staff members can fully address parents' concerns is to have the student come to SJS in John Quincy Adams House and sign a waiver granting parental access to his or her records. Once the student signs a FERPA waiver, SJS staff members will fully discuss the student's case with anyone listed on the waiver.

http://gwired.gwu.edu/osjs/FrequentlyAskedQuestions/ForParents/ (last visited April 20, 2011)

(emphasis on word "may" added, remaining emphasis in original).

Doe's reliance on the Q&A, however, is completely misplaced. Indeed, the recital on which Doe relies describes an exemption to FERPA's otherwise general prohibition against disclosing student information. And the passage never even hints that GW informs parents whenever their child faces an alcohol-related disciplinary case; instead, it only provides that GW "may" do so. Plus, the passage makes clear that, even in such cases, "the best way to ensure SJS staff members can fully address parents' concerns is to have the student come to SJS in John Quincy Adams House and sign a waiver granting parental access to his or her records."

Here, Doe *refused* Assistant Director Christopher's offer to inform his parents of the pending charges when he met with her before the hearing. Indeed, he did not authorize GW to release information to his parents until February 17, 2011, the day on which Vice President Kownwerski issued his sanction decision.

As to Doe's friend ███████ Doe never asked Assistant Director Christopher, or anyone in SJS, to compel him to attend. Instead, Doe told Assistant Director Christopher that ███ would accompany him to the hearing. Additionally, Doe said that he had no objection to proceeding without ████, since the Hearing Board had his statement.

As to the decision to separate Doe and Roe at the hearing, requiring him to cross examine her by proxy, and delegating his appeal to a three-person panel, GW's actions were in keeping with its long-established practice. Thus, under *Pride*, they became part of its contract.[12]

The foregoing establishes that Doe is unlikely to prevail on his breach of contract claim. Instead, as a matter of law, that claim is doomed.

---

[12]    See *Cloud v. Trs. of Boston Univ.*, 720 F.2d 721, 725 (1st Cir. 1983) (no contract violation for university to permit complainant to testify out of accused student's view, notwithstanding his right to "confront and cross examine any witness").

2.   **Doe's Negligence, Negligent Hiring, Negligent Retention, Negligent Training, and Negligent Supervision Claims Will Not Succeed**

Doe's negligence and negligent hiring, training, and supervision, and retention claims —

Counts III and IV of his Complaint — are even weaker.

First, those claims do nothing more than convert GWU's alleged contract violations into

torts. *Compare* Cplt. ¶ 47 *with* Cplt. ¶¶ 59, 60 & 63. Thus, as a matter of law, they are not

cognizable. *Jones v. Hartford Life and Accident Ins. Co.*, 443 F. Supp. 2d 3, 5 (D.D.C. 2006)

("The failure to perform a contractual obligation typically does not give rise to a cause of action

in tort. … Rather, an action for breach of contract is often 'the appropriate avenue of relief.'")

(citations omitted); *Towers Tenant Ass'n, Inc. v. Towers Ltd. P'ship*, 563 F. Supp. 566, 570

(D.D.C. 1983) ("The omission to perform a contractual obligation does not ordinarily create a

cause of action in tort as between the contracting parties. . . . Rather, an action for breach of

contract is the recognized and appropriate avenue of relief. . . . Moreover, '[t]he mere negligent

breach of a contract, absent a duty or obligation imposed by law independent of that arising out

of the contract itself, is not enough to sustain an action sounding in tort.'") (citations omitted)

(emphasis omitted); *Blake Constr. Co., Inc. v. C. J. Coakley Co., Inc.*, 431 A.2d 569, 577 n.5

(D.C. 1981) ("When two parties are in dispute over performance under a contract, their recourse

lies in a legal suit under the contract and not in an action in tort unless there are exceptional

circumstances of a violation of duty imposed by statute or law beyond the contract's terms.").

*Accord Brantley v. D.C.*, 640 A.2d 181, 183 (D.C. 1994) ("[R]egardless of the phrasing of

[plaintiff's] pleadings, the gravamen of her complaint is that [school] officials have engaged in

'educational malpractice.' The trial judge held, in conformity with the great weight of authority,

that no such tort exists, and that conduct of the kind alleged in [plaintiff's] complaint cannot be

redressed by a civil [tort] suit for damages. We conclude that the judge's decision was

24

correct.").

Second, to the extent that Doe predicates his negligence claims on the same conduct on which he predicates his discrimination claim, *compare* Cmplt. ¶¶ 50-57 *with* Cmplt. ¶¶ 58-61, Title IX preempts them. *See Brown v. Children's Nat'l Med. Ctr.*, C.A. No. 09-2456, 2011 WL 1158398, at *11 (D.D.C. Mar. 30, 2011) ("Insofar as the conduct giving rise to plaintiff's negligence claims is the same conduct giving rise to her Title VII claims, the negligence claims appear to be duplicative. Accordingly, the Court will dismiss the negligence claims without prejudice."); *Young v. Covington & Burling LLP*, 736 F. Supp. 2d 151, 163-64 (D.D.C. 2010) ("Here, the plaintiff predicates her negligent supervision claim precisely on the failure to abide by Title VII and the Human Rights Act. . . . The prevention of racial discrimination in the workplace is not a common law duty upon which a claim of negligent supervision may be based."); *Ransom v. Ctr. for Nonprofit Advancement*, 514 F. Supp. 2d 18, 24 n.4 (D.D.C. 2007) ("Further, summary judgment must be granted on the negligent supervision claim because a common law claim for negligent supervision cannot be based on an alleged violation of the D.C. Human Rights Act . . . or Title VII") (citation omitted); *Wade v. Washington Metropolitan Area Transit Authority*, No. Civ. 01-0334 (TFH), 2005 WL 1513137, at *6 (D.D.C. June 27, 2005) ("Count VI in Plaintiff's Third Amended Complaint charges WMATA and Littlefield with Negligence for failure to assure that WMATA's sexual harassment policies were not violated, and more specifically, to assure that Plaintiff was not subjected to a hostile work environment. This claim is preempted by Title VII as the injury arises out of the alleged harassment itself.").

Thus, as a matter of law, Doe's negligence claims, like his contract claim, cannot survive.

### 3. Doe's Title IX Claim

Doe's Title IX claim faces the same fate.

Title IX bars the imposition of university discipline where gender is a motivating factor

25

in the decision to discipline. *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). Thus, to

prevail on his Title IX claim, Doe must establish a "causal connection between the flawed

outcome and gender bias." Wholly conclusory allegations do not suffice. *Id.* at 715.

Doe, however, has pointed to no facts that plausibly suggest that a gender animus

motivated GW's purported misconduct. Rather, he appears to predicate his discrimination claim

on his contention that GW's findings and conclusions are erroneous. Doe Br. 22 ("Here, John

Doe, emphatically was innocent of the charge against him, and was wrongly found in violation

of GWU's sexual assault provision. That he was wrongly convicted is plain.").

But, Doe's assessment of the outcome is of no moment. Instead, "it is the perception of

the decision maker which is relevant, not the self-assessment of the plaintiff." *Vatel v. Alliance

of Automobile Manufacturers*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (quotations and citation

omitted).

The evidence establishes that GWU believed its articulated reason for disciplining Doe.

Thus, his Title IX claim cannot succeed, even if GW's reason proves to be mistaken. *George v.

Leavitt,* 407 F.3d 405, 415 (D.C. Cir. 2005).

Doe's reliance on Yusuf v. *Vassar College*, contributes nothing to his case. As the

Second Circuit stated in *Yusuf,* a plaintiff asserting a disparate impact claim must establish a

"causal connection between the flawed outcome and gender bias," and "wholly conclusory

allegations [do not suffice]." 35 F.3d 709, 715 (evidence of causal connection may include, for

example, "statements by pertinent university officials, or patterns of decision-making that also

tend to show the influence of gender).

Doe has put forth *no evidence* supporting his assertion that GW's process has a

discriminatory impact on males. *See* Memo. at 21-23. Rather, at most he asserts, without any

support, that GW's disciplinary process is "friendly" to allege victims and that "[o]nly men are typically charged in sexual assault." Doe Br. 23.

*Brzonkala v. Virginia Polytechnic & State Univ.*, 935 F. Supp. 772 (W.D. Va. 1996), is instructive. Christy Brzonkala, a female student at Virginia Polytechnic and State University ("VPI"), filed Title IX claims against VPI challenging its disciplinary decisions with regard to a male student who she alleges raped her. The district court dismissed Ms. Brzonkala's Title IX claims because she did not "present any statistical allegations from which [the court] can reasonably infer that VPI's conduct was based on illegal discriminatory intent." *Id.* at 777. *See also Greater New Orleans Fair Housing Action Center v. United States Dep't of Housing & Urban Dev.,* Nos. 10-5257 & 10-5269, -- F.3d --, 2011 WL 1327713, *6 (D.C. Cir. Apr. 8, 2011) (denying motion for preliminary injunction for disparate impact claims unsupported by "proof . . . measured in some plausible way").

The court also rejected Ms. Brzonkala's "false comparison" of VPI's treatment of her, the alleged victim, during the judicial process with its treatment of the accused student. In doing so, the court found that victims and accused "are not similarly situated with regard to these proceedings, and so any comparison is of little relevance." *Id.* The *Brzonkala* court ultimately found that "[t]he genders involved are inconsequential to VPI's proximate intent," given that the judicial proceedings are no different for males and females. *Id.* at 778.

Like the judicial proceedings at issue in *Brzonkala,* Doe has failed to put forth anything other than conclusory allegations that GW's disciplinary proceedings unlawfully discriminate against males. Thus, his Title IX claim cannot survive.

### 4.   Doe's Intentional Infliction of Emotional Distress Claim

Doe's intentional infliction claim also cannot succeed.

To prevail on his intentional infliction claim, Doe must prove: (1) "extreme and

27

outrageous" conduct on the part of the defendant; which (2) intentionally or recklessly; (3) causes the plaintiff to suffer "severe" emotional distress. *Sere v. Group Hospitalization, Inc.,* 443 A.2d 33, 37 (D.C. 1982); *Waldon v. Covington,* 415 A.2d 1070, 1076 (D.C. 1980).

The tort's parameters are exceedingly narrow, applying *only* when the defendant's conduct goes "beyond all possible bounds of decency and (is) regarded as atrocious and utterly intolerable in a civilized community." *Waldon,* 415 A.2d at 1076 (quoting RESTATEMENT (2D) TORTS § 46, comment d (1965)). This is an extremely demanding standard that is rarely met. *Dale v. Thomason,* 962 F. Supp. 181, 184 (D.D.C. 1997); *Drejza v. Vaccaro,* 650 A.2d 1308, 1312 (D.C. 1994). And it is for this Court to determine in the first instance whether a defendant's alleged conduct may reasonably be regarded as so "extreme and outrageous" as to permit recovery. *Sere,* 443 A.2d at 37.

The Court of Appeals' decision in *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624 (D.C. 1997), is instructive. Kerrigan sued Britches for intentional infliction of emotional distress. He alleged that Britches targeted him for a sexual harassment investigation, manufactured evidence against him in order to establish a false claim of sexual harassment, leaked information from the investigation to other employees, and unjustifiably demoted him to promote a woman in his position.

The District of Columbia Superior Court granted Britches' motion for summary judgment. And the Court of Appeals affirmed, stressing that the alleged conduct did not "'as a matter of law, rise to the level of outrageous conduct.'" *Id.* at 628, quoting, *Howard Univ. v. Best,* 484 A.2d 958, 986 (D.C. 1984).

Neither does disciplining a student for committing a sexual assault. To the contrary, the issue is not even close. *See, e.g., Fellheimimer v. Middlebury College,* 869 F. Supp. 238, 247

28

(D. Vt. 1994) ("A college's decision, when confronted with a female student's accusation of rape, to confront the male student with the charges, hold a hearing, and support the findings of the initial tribunal on appeal, *even where various procedural errors are alleged*, cannot form the basis of an [intentional infliction of emotional distress] claim.") (emphasis added); *accord McManus v. MCI Commc'ns. Corp.*, 748 A.2d 949, 958 (D.C. 2000) (affirming trial court's judgment that expulsion of plaintiff from club for alleged misbehavior did not fall within the meaning of extreme or outrageous conduct); *Howard University v. Best,* 484 A.2d 958, 985 (D.C.1984) (allegation that defendants "threw" plaintiff out of hospital and canceled his surgery, after he protested the presence of a particular doctor during his surgery, did not rise to the level of outrageous conduct necessary to sustain claim of intentional infliction of emotional distress).

In sum, Doe's intentional infliction claim, like his previously discussed claims, likely will fail as a matter of law.  Indeed, apparently recognizing that conclusion, Doe has not argued otherwise.

## D.   BALANCING THE RESPECTIVE HARMS FAVORS GWU.

Unlike Doe, whose alleged injuries are compensable, *see* pp. ___ - ___, *supra*, GW will suffer crippling harm if the Court leaves the temporary restraining order in place and grants his motion for preliminary injunctive relief.

GW students occupy positions of trust with the University.  Doe betrayed that trust when he sexually assaulted another student.  And, GW suspended Doe, under the Code, for his misconduct.

Requiring the University to ignore its decision would emasculate the Code, to the utter detriment of the entire University community.  *See Lucey v. Nevada ex rel. Bd. of Regents*, No. 2007 CV 00658, 2007 WL 4563466, at *12 (D. Nev. Dec. 18, 2007) ("[University's] interest in

29

ensuring that student conduct violations are dealt with to promote education for the individuals

involved and other members of the campus community" outweigh plaintiff's interests and

therefore injunction inappropriate); *Sohmer v. Kinnard,* 535 F. Supp. 50, 53 (D. Md. 1982)

(same); *Bleicker v. Board of Trustees*, 485 F. Supp. 1381, 1389 (S.D. Ohio 1980) (denies

injunction because "[d]efendants have a considerable interest in protecting the integrity of their

published academic standards and disciplinary regulations"); *Ray v. Wilmington Coll.*, 667

N.E.2d 39, 41-42 (Ohio App. 1995) (recognizes university's need to protect its integrity; court

allows university to discipline students for off-campus conduct that the university considers

detrimental to the institution).

There is no justification for subjecting GW to such overwhelming harm. Rather, the

conclusion is unavoidable that the Doe's request for interim injunctive relief must fail.

E.    THE PUBLIC INTEREST FAVORS DISSOLVING THE TEMPORARY
       RESTRAINING ORDER AND DENYING DOE'S MOTION FOR PRELIMINARY
       INJUNCTIVE RELIEF.

Courts are ill-equipped to run private universities. *Bilut,* 645 N.E.2d at 542.

Accordingly, they are reluctant to "intrude into the sensitive area of the student-college

relationship, *especially* in the areas of curriculum and discipline." *Guckenberger v. Boston*

*Univ.,* 974 F. Supp. 106, 150 (D. Mass. 1997) (emphasis added). That reluctance is particularly

acute in response to student requests for preliminary relief that would essentially overturn a

university's disciplinary decision. *See Lucey*, 2007 WL 4563466, at *12 (public interest served

by denying student's request for interim relief, because while students "have an interest in

ensuring that they are given fair disciplinary procedures, the University community at-large has

an interest in ensuring that students who violate the Conduct Code are not excused from

disciplinary sanctions"); *see also Sohmer*, 535 F. Supp. at 53 (recognizes importance of allowing

30

school to enforce its disciplinary rules).

Thus, the public interest favors dissolving the temporary restraining order and denying Doe's motion for preliminary injunctive relief.

**F.      If the Court Awards Preliminary Relief, it Should Require a Bond.**

Doe contends that, if the Court grants his request for interim injunctive relief, it should exempt him from Rule 65's bond requirement. Not so.

Rule 65 makes clear that a court may issue a preliminary injunction or temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." [n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." *See Monzillo v. Biller,* 735 F.2d 1456, 1461 (D.C. Cir. 1984) (citing *Edgar v. MITE Corp.,* 457 U.S. 624, 649 (1982)). The Court may waive the bond requirement under limited circumstances, but the party seeking waiver must establish that an exemption is warranted. *See Brown v. Artery Org., Inc.,* 691 F. Supp. 1459, 1462 (D.D.C. 1987) (proof of plaintiff's poverty justifies nominal bond). Here too, Doe has not carried his burden.

GW charges tuition and other necessary fees to its students. Thus, if the Court orders GW not to suspend Doe without requiring him to post a bond, and GW ultimately prevails on Doe's claims, GW not only would have incurred needless costs in this litigation, but it also would have provided free educational services to Doe while the case was pending. Such a result would compromise GW's business interests and unfairly burden all other tuition-paying GW students by compelling them, in effect, to subsidize Doe. *See Basch,* 370 A.2d at 1368 (granting

31

relief sought by plaintiffs that would require GW to "operate at a financial loss would . . . have a direct effect on the quality of education the University could provide").

Surely, that is not a result that this Court should countenance.

## III.     CONCLUSION

GW suspended Doe because it found that he committed extremely serious Code violations. Unhappy with that decision, he has sued.

But, Doe likely will lose his underlying claims. He will suffer no irreparable harm if the Court denies him interim relief. And the balance of harms clearly favors the GW, as does the public interest.

Accordingly, GW submits that the Court should dissolve the temporary restraining order and deny his motion for a preliminary injunction.

Respectfully submitted,

Henry Morris, Jr. (D.C. Bar #375894)
Donald B. Mitchell, Jr. (D.C. Bar #358751)
Kristine J. Dunne (D.C. Bar #471348)
**ARENT FOX LLP**
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5339
Telephone:  (202) 857-6000
Facsimile:  (202) 857-6395

*Attorneys for The George Washington University*

Dated: April 20, 2011

32

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of April, 2011, the foregoing Redacted Opposition to Doe's Motion For Interim Injunctive Relief, Declaration and Exhibits of Emerald Christopher and Declaration and Exhibits of Tara W. Periera were served using the Court's ECF/CM system on all attorneys who are registered to receive service electronically.

    /s/ Donald B. Mitchell, Jr

Donald B. Mitchell, Jr (D.C. Bar # 358751)

**ARENT FOX LLP**

1050 Connecticut Avenue, N.W.

Washington, D.C.  20036-5339

Telephone:  (202) 857-6000

Facsimile:  (202) 857-6395

Email:  mitchell.donald@arentfox.com