IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN DOE,

Plaintiff,

v.

GEORGE WASHINGTON UNIVERSITY,

Defendant.

Case No. 1:11-CV-696 (RLW)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR INTERIM INJUNCTIVE RELIEF**

COMES NOW the Plaintiff, designated as John Doe, and files this Reply Brief in further support of his Motion for a Temporary Restraining Order and Preliminary Injunction. The Court has already granted a Temporary Restraining Order in this case, which was extended with the consent of the parties to allow briefing on a preliminary injunction. Defendant George Washington University (hereinafter "GW"), has filed an Opposition Memorandum, and this Reply Memorandum sets forth why John Doe is entitled to a preliminary injunction.

## ARGUMENT

### I. John Doe Will Suffer Irreparable Harm Without a Preliminary Injunction

As suggested by this Court, John Doe begins this Reply Brief by explaining how he will suffer irreparable harm if the Court does not grant a preliminary injunction.[1] To be clear, the harms that John Doe will suffer are of at least three types.

First, John Doe will lose the academic work that he has completed so far this semester, and will have to re-take these same courses, essentially losing a half a year of his life. John

[1] As noted below, however, no irreparable harm is actually required for this Court to grant injunctive relief to preserve the status quo under D.C.'s Human Rights Act. See II-E, infra.

Doe's grades this semester are improved over last semester; of his six courses, he is on track to have an A in four of them. See Ex. A (Declaration of John Doe). He has worked diligently at his coursework, despite the significant distractions that are apparent from any reading of the descriptions of the facts in this lawsuit, and he is on track to complete his coursework and earn good grades. He will lose all of the results of this labor if a preliminary injunction is not granted, and his final exams are not graded. See Exhibit A (last exam is scheduled for May 4, 2011). These substantial efforts of a wronged student will be extinguished forever.

Second, if the Court does not issue a preliminary injunction, GW will place a notation on John Doe's transcript that will state that he violated GW's Code of Student Conduct, and that he has been suspended from the University for a period of one year. If John Doe seeks to transfer to a different school, as he is likely to try to do after having been falsely convicted of sexual assault by GW, it is a virtual certainty that he will be unable to attend a school of GW's caliber or selectiveness. Attached as Exhibit B is a Declaration by Edward Custard, a college admissions expert. As Mr. Custard explains, John Doe is likely to be able to be admitted only at a community college or public institution with an "open" admissions policy, if a notation of this sort is placed on his transcript. The loss of graduation from an excellent educational institution will echo throughout the rest of John Doe's life, and is not properly resolved through monetary damages. The ultimate impact of where one attends college affects more than a person's salary earned in myriad ways not easily quantifiable. See Berger & Berger, ACADEMIC DISCIPLINE: A GUIDE TO FAIR PROCESS FOR THE UNIVERSITY STUDENT, 99 Colum. L. Rev. 289, 323 (1999) ("the prestige of the diploma-issuing school bears quite directly on the graduates' economic opportunity and likely social and political influence") (emphasis added). And any effort by John Doe to calculate even future salaries lost would likely be challenged as speculative, casting into

doubt any view that damages can provide him with a full and fair recovery. The only way that John Doe can have any assurance of real relief is to prevent such harms from occurring in the first place, through this Court's extension of its current injunctive relief.[2]

Finally, GW's wrongful sanction will also create a substantial and unwarranted stigma. The interests of students in completing their education, as well as avoiding unfair or mistaken exclusion from the education environment, and the accompanying stigma, are, of course, paramount. In the public university arena, in the context of constitutional due process analysis, courts have recognized not only accused students' "property" interests in assuring an accurate result, but also a separate "liberty" interest in avoiding the stigma of a wrongful sanction. While certain "property" losses, such as paid tuition and the loss of John Doe's scholarship, perhaps might be recovered through damages in the instant case, John Doe's separate "liberty" harm in avoiding unfair stigma can be remedied only through a continuation of this Court's injunctive relief, to prevent GW from unfairly branding him. See Berger & Berger, 99 Colum. L. Rev. at 303 ("More than a property or contractual interest in his education is at issue here. Ultimately at stake is the student's 'liberty' interest in his good name.").[3]

These injuries are irreparable. They are not speculative and they cannot be adequately compensated by a future damages award. John Doe has spent years accumulating a record of

---

[2] If the Court does not issue a preliminary injunction, John Doe also will be unable to stay in school at GW while he applies to other schools. This too may cause him to have an unexplained gap on his transcript which will, in turn, diminish his educational prospects. He will not be able to get into a school which is commensurate with what his grades and test scores would otherwise allow, and he will not be able to enjoy the same level of educational accomplishment and interactions as he would if he were not falsely determined to have committed a sexual assault, contrary to GW's policies and promised procedures.

[3] To be clear, John Doe is not arguing here that he has a constitutional due process right that is enforceable against GW. Rather, because stigma is the kind of harm which is irreparable in the due process context, it should be irreparable here as well. The ability of the harm to be remedied does not vary based on what kind of institution inflicts it.

success and academic achievement. Without a preliminary injunction, it will disappear behind this false charge of sexual assault.

A number of courts have recognized and confirmed this harm as irreparable. In a case involving a nursing school student suspended from school, the United States Court of Appeals for the Fourth Circuit articulated four separate harms; there, "without a preliminary injunction [the plaintiff] will obviously suffer irreparable injury: she will be barred from taking courses during the spring semester, delaying the time at which her ability to work as a nurse will come to fruition; she will have a gap in her education which she will be forced to explain throughout her professional life; and she will be deprived of the opportunity to complete her education with her fellow classmates." Jones v. Board of Governors of University of North Carolina, 704 F.2d 713, 716 (4th Cir. 1983). John Doe is similarly situated. Just as the Fourth Circuit found these harms to be irreparable, so, too, should this Court.

A similar conclusion was also reached in Doe v. Manning, 1994 U.S. Dist. LEXIS 3391, *12 (W.D. Va. 1994), where the Court noted that "[t]here is little doubt that the harm to a student from a suspension can be irreparable." See also Melvin v. Union College, 195 A.D.2d 447, 448 (N.Y. App. Div. 2d Dep't 1993) ("without an injunction to preserve the status quo a suspension for two semesters will cause her irreparable injury for which monetary compensation is not adequate"); Tully v. Orr, 608 F. Supp. 1222, 1226 (E.D.N.Y. 1985) (finding that an Air Force Cadet faced with disenrollment would suffer an irreparable harm because "plaintiff will be delayed in both his graduation and commissioning as an officer).

Courts have specifically recognized that the harm of being stigmatized by a suspension is irreparable. Manning at *13; see also Tully, 608 F. Supp. at 1226 ("the indelible stigma of having once been disenrolled, cannot help but have a deleterious effect on plaintiff's future as an

Air Force Officer. Such harm cannot be adequately compensated at law.”). “Ordinarily, a preliminary injunction would seek to relieve this kind of stigmatic harm by mandating immediate due process, that is, an opportunity for the student to clear her name.” Id. This is precisely the harm that John Doe will suffer from having been falsely branded a person who has committed a sexual assault. As Manning recognizes, the mere stigma of a false accusation is sufficient to constitute irreparable harm. In this case, the harm is more acute because it is not just the stigma of a false finding of guilt, but, also the prejudice John Doe will suffer as he attempts to move on with his life at another school. See Ex. B.

GW gives short shrift to the additional case cited by the Court in its Order granting a Temporary Restraining Order, Coulter v. East Stroudsburg University, 2010 U.S. Dist. Lexis 43866, *9-10 (May 5, 2010, M.D. Pa.). There a United States District Court held that a student who “has attended almost an entire semester of classes and was in good academic standing” would suffer an irreparable harm if she was not allowed to sit for her final exams because “she will have lost all the time and effort expended in her courses during the Spring 2010 semester, which she can never get back.” GW asserts that Coulter should be disregarded because it does not “distinguish, or even mention, the long line of [almost exclusively state court] cases” cited in GW’s brief. GW Opp. Mem. at 18 n. 7 (clarification added).

Presumably, the Coulter court ignored the cases cited by GW because they are highly distinguishable factually. For example, the Court in Stockstill v. Quinnipiac University, 2010 WL 2011152, at *5 (D. Conn. May 19, 2010) did decline to issue a preliminary injunction because the plaintiff-student in that case did not show irreparable harm. However, what GW fails to disclose is that the student in that case could not show irreparable harm because he was barred from attending the defendant-school Quinnipiac University, in Connecticut, by the terms

of a state-court probation restriction that did not let him leave Florida. Id. at *19. As the Court observed, "Plaintiff was unable to legally fulfill his responsibilities as a lacrosse player for Quinnipiac during the Spring 2010 semester not because of Quinnipiac's actions, but because of his probationary status resulting from his criminal offense." Id. John Doe obviously faces no similar restriction here, and Stockstill is inapposite.

The other cases relied upon by GW are similarly unhelpful. Ben-Yonatan v Concordia College Corp., 863 F. Supp. 983 (D. Minn. 1994), for example, involved a plaintiff whose sole supported injury would be the loss of one year of a medical doctor's salary. Id. at 986.[4] Because a doctor's salary is readily determined to have monetary value, it was not deemed an appropriate candidate for injunctive relief. John Doe, here, has alleged and supported a greater set of harms, more consistent with the cases, cited above, where injunctive relief was granted.

Another case cited by GW, Bilut v. Northwestern University, 645 N.E. 2d 536, 541-42 (Ill. App. Ct. 1994) involved a student in a Ph.D. program who had already been attempting to finish her dissertation for five years without progress. Id. at 539. The plaintiff wanted two more years to work on her graduate studies. Id. at 541. However, as the court noted, "Plaintiff presented no evidence that she would be able to obtain a degree from defendant if given a two year extension." Id. For that reason, the Court found that an injunction was unlikely to prevent a harm. Id. There is simply no similar failure of motivation on the part of John Doe in this case. He is not only on track with all of his academic pursuits, but also is excelling.

GW's citation of Boehm v. University of Pennsylvania School of Veterinary Medicine, 573 A.2d 575, 586 (Pa. Super. Ct. 1990) is also unhelpful. As the Boehm Court explained its holding, the preliminary injunction was not appropriate there because the plaintiff was not likely

[4] The plaintiff did assert that she would be unable to enter medical school with a suspension on her transcript, but this fact was not supported by affidavit and was, therefore, disregarded by the Court. Id. at 986.

to be successful on the merits: "Although circumstances may vary from case to case, where, as here, it is unlikely that the students will be able to obtain a judicial reversal of their suspension, Shulman represents the better approach." Id. at 586 (citing Shulman v. Franklin & Marshal College, 538 A.2d 49, 52 (Pa. 1998), a case previously described as standing for the proposition that "[i]n view of fact that it was not likely that the student would prevail on the merits . . . there was no irreparable harm to be avoided by entering a preliminary injunction.").

In short, there is a body of law articulating a real and irreparable harm to a student who is wrongly suspended from school. GW has cited to a number of cases, largely from state courts, that involve very different facts. Though the law on this question is not uniform, it strongly tends toward finding that suspension from a university is an irreparable harm.

## II. Plaintiff John Doe Is Likely To Prevail On The Merits of his Claims

Plaintiff John Doe is likely to prevail on one or more of the seven claims against GW that are set forth in his Amended Verified Complaint.

### A. John Doe Is Not Guilty of Sexual Assault

Faced with a former FBI polygrapher's verification that John Doe had been telling the truth when he stated that Jane Roe kissed him, stroked his penis, and removed her underwear before they had sex, GW decides to simply ignore this evidence as if it did not even exist (or raise obvious questions as to Jane Roe's credibility). Instead, GW advances the argument that John Doe was guilty of sexual assault because Jane Roe was intoxicated. GW states that "Doe admitted he had sex with Roe and that she was 'obviously drunk' leading to the incident. Accordingly, GW concluded that Doe violated its prohibition against sexual assault." Opp. Mem. at 1. At various places in its Opposition, GW implies that simply because Jane Roe was perceived to be drunk, the fact that John Doe had sex with her is a per se violation of GW's

Student Code. Opp. Mem. at 10-11 (quoting extensively the portions of the transcript of the hearing where John Doe stated that he knew Jane Roe was drunk).[5]

The mere fact that John Doe may have believed that Jane Roe was intoxicated does not establish that John Doe is guilty of sexual assault. In short, GW's attorneys are misrepresenting the GW Code of Student Conduct's parameters.

The Code establishes a requirement that sexual contact be consented to, but it does not prohibit sex between intoxicated participants. The Code defines sexual assault as "[i]nflicting any sexual invasion (including but not limited to sexual intercourse) upon any person without that person's consent." See John Doe Motion for a Temporary Restraining Order And Preliminary Injunction ("Doe Mot.") Ex. B. Consent, in turn, "requires actual words or conduct indicating a freely given agreement to have sexual intercourse or to participate in sexual activities."[6] Doe Mot. Ex. B.

The Code does not prohibit sex with a person who is intoxicated. Rather, the Code states that evidence about impairment is simply relevant at disciplinary hearings: "the degree of impairment of a person's ability to give or withhold consent (including but not limited to

---

[5] GW takes these isolated comments of John Doe out of context, wholly failing to reveal to this Court the numerous other clarifying comments John Doe made about Jane Roe's perceived level of intoxication. *See, e.g.,* Tr. at 68 ("She didn't look terribly drunk because we were able to sign in with no problems, so I was not aware of how drunk she was."); Tr. at 69 ("I was unaware of her blacking out"); Tr. at 69 ("my roommates … they did not think she was overly drunk, none of them came up to me saying she's drunk get her out of here. So she seemed fine from what we could tell."); Tr. at 71 ("She was not incapacitated in any way"); Tr. at 75 ("nothing that would tell me that she was plastered out of her mind, that she was incapable of walking places or anything"); Tr. at 75 (no slurred speech at all that night that Doe could tell); Tr. at 78 ("She just said she had shots of tequila, she did not say how many, she did not say she had any of the other drinks that she listed in her statement either"); Tr. at 97 ("she gave no signs to show that she was blacked out or completely incapacitated while we were in bed."). Right after the "obviously drunk" comment GW cites, in fact, John Doe stated: "I was not aware of how drunk she was, and if I had known, I guess things would have definitely turned out differently…." Tr. at 73.

[6] GW describes this as requiring "express and knowing consent." Opp. Mem. at 3. If by "express" GW means "explicitly stated," GW's description of the Code is wrong. The Code allows consent to be made by "words or conduct." Doe Mem. Ex. B (emphasis added). Jane Roe removed her underwear and positioned herself in a way to suggest that she wanted to have sex; this conduct satisfies the Code's consent requirement. See also Doe Mem. Ex. A, at 22 (noting how GW may wish to consider changing its Code to adopt a "verbal consent only" approach, but that it would be patently unfair to apply such an unwritten standard retroactively to kick out a student never given notice that such a rule was secretly in effect).

incapacity or helplessness caused by alcohol or other drugs) may be introduced as pertinent information at any University disciplinary hearing." Doe Mot. Ex. B. In other words, contrary to GW's argument here, impairment is relevant but not dispositive. The Code merely reinforces the common sense idea that if a person is so intoxicated as to be inert (i.e., is "incapacit[ated] or helpless[]"), the person is unable to express consent through words or action.

This is, in essence, a far cry from the standard GW now relies on – that a person who is intoxicated is per se unable to consent. GW's argument – that because John Doe acknowledged that Jane Roe was intoxicated, he is guilty of a sexual assault – must be rejected.

### B. Breach of Contract

This Court previously determined, after reviewing the Emergency Motion for a Temporary Restraining Order, that Plaintiff had made a "preliminary showing of a likelihood of success on the merits on his breach of contract claim." See Order, Docket #8, at 1. This Court's initial impressions of a viable claim were correct. Because Defendant GW's latest filing does not overcome Plaintiff's likelihood of succeeding on the merits of his contract claim, a preliminary injunction should be entered in Plaintiff's favor.

GW acknowledges that the Code constitutes a contract between the school and John Doe, but argues that Pride v. Howard University, 384 A.2d 31 (D.C. 1978) excuses it from breaking its promises to students contained in the Student Code. This is not so.

Pride, decided by the D.C. Court of Appeals a year after this court's decision in Giles v. Howard University, 428 F. Supp. 603 (D.D.C. 1977), amplifies and reinforces the Giles court's determination that, in construing a contract between a student and university, "the standard is that of reasonable expectation – what meaning the party making the manifestation, the University, should reasonably expect the other party to give it." Giles, 428 F. Supp. at 605. The

Giles court, applying this standard, interpreted the contract as a reasonable student at the school would understand it. Giles, 428 F. Supp. at 606 ("After reading the Student Promotions Policy, the reasonable expectation of any student is that if he fails a course and does not make up the deficiency in the Directed Study Program, he can be dismissed or can be retained upon compliance with any reasonable condition.").

A year later, the Pride court reached substantially the same conclusion. There, a student brought a breach of contract action against Howard University for failing to comply with its contract with students. Specifically, the student appealed an adverse misconduct determination because his appeals board did not have nine members, as required by the Howard Student Code; instead, four students were unable to attend the meeting of the school's appellate body. Pride, 384 at 33. The student's argument in Pride was that, because there was no express provision for a quorum, only a full appeals panel was authorized to hear an appeal. Id. at 34. Because some of the members were absent, the student argued the school breached its contract with him. Id.

The Pride Court rejected this interpretation of the Howard Student Code, noting that the school's custom was to replace graduated students in the Fall of each year. Id. at 35-36. Combining this custom with the student's reading of the Howard Code would have meant that for many months, the school would have been unable to resolve disciplinary cases at all. Id. The court rejected the student's interpretation of how the Code would work in practice as inconsistent with what any reasonable student would expect from the disciplinary code. Id. at 34.

Thus, while the Pride court did discuss how the customs of a University can alter the interpretation of a contract with a student, it did so with reference to the reasonable interpretation that students would have of the school's student Code. Id. (when interpreting a student code, "'the document itself must be viewed as a whole' and 'the court should view the language of the

document as would a reasonable person in the position of the parties.'") (quoting Basch v. George Washington University, 370 A.2d 1364, 1366 (D.C. 1976)). The ultimate question, however, under D.C. law, is whether a school's interpretation of the contract is consistent with how a reasonable student would understand the Code.[7]

Here, GW cannot justify how it handled this case by reference to Pride. GW's breaches of its promises to John Doe are far more extensive than the technical problem that the student in Pride complained about. John Doe's hearing was fundamentally unfair, and, of all the procedural guarantees in the GW Code, procedural fairness is a touchstone. Moreover, Pride does not allow a school to reject wholesale its express policies whenever it ignores them long enough. A school does not get an easement against its students' rights by denying those rights for a specified period of time. Rather, while customs can shade the interpretation of a contract, but they cannot vitiate a contract's plain language. To allow the school's customs to simply eliminate clear contract language would not be how "a reasonable person in the position of the parties" would understand the contract. Id.[8]

In Giles, in fact, the Court made clear that deviations from a university's written contract with its students are not to be ignored:

> This case is unlike Levine v. George Washington Univ. School of Medicine & Health Sciences, Civil No. 8230 (D.C. Super. Ct. Sept. 7, 1976), where the defendant University entered into a contractual arrangement upon which the

---

[7] This is a doctrinally different rule than the "substantial compliance" cases cited by GW. See Opp. Mem. at 20. Though even "substantial compliance" does not mean "any compliance." See Fellheimer v. Middlebury College, 869 F. Supp. 238 (D. Vt. 1994), the "substantial compliance" cases in this context only caution courts to be "wary of the wholesale application of commercial contract principles in the academic context," and "they do not alter the general proposition that a College is nonetheless contractually bound to provide students with the procedural safeguards that it has promised." Id. at 243 (emphasis added).

[8] The reliance on custom in a case such as this is more problematic when one considers the Giles requirement to look at the contract from the point of view of a reasonable student. These proceedings are confidential. There is no way that any student can know how GW handles these cases without having been in one. Thus, a reasonable student would be completely ignorant of the customs of the school for disciplinary cases involving sexual assault; the school's customs simply cannot inform such a student's interpretation of the Code.

student reasonably relied and then provided its own subjective interpretation of the agreement, without notice, to the student's detriment.

Giles, 428 F. Supp. at 606 n.2. Of course, this is exactly what happened in the present case. GW either failed to follow its own rules or repeatedly changed the rules unilaterally, in unanticipated ways, often without adequate advance notice or any notice at all, and always to the detriment of John Doe. These deviations included:

- Failing to preserve physical evidence;
- Failing to compel a witness for John Doe to testify before the Hearing Board meeting, and even advising John Doe's roommates that their attendance would not be required at John Doe's hearing;
- Removing John Doe from the Hearing Board room while crucial testimony was being provided by the complaining witness;
- Requiring John Doe to cross-examine Jane Roe only by proxy; and
- Delegating his appeal to just three members of the Committee on Judicial Systems.

The last of these items provides a useful example. GW's Student Code states that an appeal – if deemed "viable" by the Senior Assistant Dean of Students (as it was here) – will then "be forwarded to the Committee on the Judicial System for its review." Student Code § 33. The composition of this Committee is set forth in Student Code § 20(d), where the appointment methods for each of its seven members are specifically described. Although this provision does define a quorum as consisting of three members, nothing in Student Code §§ 20(d) or 33, or any other part of the Student Code authorizes this Committee to meet in 3-member panels, or to exclude any members of the Committee (much less a majority of its members) from participating in the decision-making process. A quorum of the U.S. Supreme Court consists of six Justices,

see 28 U.S.C. § 1, yet nobody would suggest that this means only six Justices need be asked to decide a given case. That situation simply would never occur.

Here, GW has now acknowledged that a majority of its appellate body was excluded from even participating in the review of John Doe's appeal.[9]

On a larger scale, this concession that a GW administrator personally selected the members of the appeals committee is truly remarkable. And it is all the more remarkable given Pereira's pivotal role in the disciplinary charging process itself. As Dean Pereira acknowledges, she was the same individual who earlier had been responsible for making the charging decision against John Doe. See Pereira Declaration § 7 ("I decided to charge Doe with three violations of GW's Code of Student Conduct."). So in this case – as George Washington now acknowledges – the same person who decided to file charges against John Doe also secretly chose which judges would hear his appeal.

Even if the Court were to apply the "relaxed" standard of "substantial compliance" that GW asserts controls its contract with John Doe, GW has not come close to substantially complying – no student reading this Student Code would ever reasonably anticipate that the same GW official who had made charging decisions would be secretly cherry-picking the three members of the appeals panel she wanted to hear the appeal, with a majority of the Committee on Judicial System excluded from that appellate process. John Doe was denied his right under

[9] Although both this case and Pride involved the composition of appeals boards, the similarity is merely superficial for a number of reasons. First, the persons serving on the Judiciary Board and Board of Appeals in Pride were merely absent – they were not affirmatively excluded from the process. See Pereira Declaration § 12 ("I chose the 3 Committee on Judicial System members who heard Doe's appeal."). There was no suggestion there, as there is here, that the process itself was manipulated. Moreover, the reduced composition of the deciding bodies was openly revealed to the student in Pride, allowing an objection. Here, the exclusion of four of the seven members of the Committee on the Judicial System occurred in secret, before a three-member panel was chosen by Dean Pereira to decide John Doe's fate. Finally, and most significantly, requiring an appeal to go to the entire Committee at GW would not render the school unable to hear disciplinary cases for months at a time, in the same way the interpretation offered in Pride would have.

the Code to have the Code's described appellate panel review the extensive new evidence he presented establishing his innocence – evidence that the Senior Assistant Dean of Students acknowledged had "viability," but which the original Hearing Panel had been deprived of considering due to numerous other, earlier contract violations by GW.[10]

Recognizing that it cannot viably represent compliance with its own stated procedures, GW also points to various provisions in its Code of Student Conduct, in an attempt to try to suggest that its contract with John Doe contained so many caveats that in reality it contained no enforceable rights. See Opp. Mem. at 3-4. But these provisions do not support GW's position. For example, as the cited provisions themselves make clear, the Code provisions themselves cannot properly be ignored: No "major" deviation of any kind from the Code is authorized; rather, the Code's clarification says that it is only a "minor deviation from procedural guidelines for hearings" that will "not invalidate a decision or proceeding resulting from a conference or hearing," with even such minor deviations sometimes requiring a reversal if "significant prejudice to the accused … may result."

Moreover, even if GW's contract had more clearly reserved a right to unilaterally make changes to its rules and regulations at any time, this same argument was raised as a defense – but rejected by the D.C. Circuit – in Greene v. Howard University, 412 F.2d 1128, 1134-35 (D.C. Cir. 1969). Examining a similar provision in Howard University's Handbook, the Court noted: "This qualifying provision, so it is said, relieves the University of any and all obligations of any kind with respect to the observance of its regulations, and vests in the University unfettered discretion." 412 F.2d at 1134. The D.C. Circuit was singularly unimpressed: "we think some qualifications come into being – qualifications, moreover, which are not to be automatically

[10] By the time John Doe learned of Dean Pereira's secret selection of these three members, of course, it was already too late – he was told that the "Committee" had acted, and that under Code of Student Conduct § 33, their determination was "final and conclusive."

considered as negated by the disclaimer invoked here, nor which indeed, are necessarily at odds with it as a matter of rational interpretation of the bargain the parties may be taken to have struck." Id. at 1134-35. Accord Fellheimer v. Middlebury College, 869 F. Supp. 238, 244 (D. Vt. 1994) (escape provision did not lead court to conclusion that the college would be free to administer disciplinary proceedings in any manner it desired).

Viewing this contract between GW and John Doe as a whole and from the point of view of a reasonable student, as this Court must, the terms that GW wrote for itself and its students are clearly part of an enforceable contract. GW violated that contract.

John Doe is likely to prevail on his contract claim. Accordingly, preliminary injunctive relief ought to be granted.

### C. Negligence and Negligent Hiring, Retention, Training and Supervision

GW argues that because an enforceable contract claim exists, no tort claim can exist, since Plaintiff is seeking to "convert GWU's alleged contract violations into torts." Opp. Mem. at 24.[11] But this argument completely misapprehends Plaintiff's negligence claims.

GW's citations – all from outside of the student disciplinary context – simply refer generally to how a "failure to perform" or an "omission to perform" a contractual obligation will not give rise to a tort claim. It is true that a person's non-feasance – a passive failure to perform a promise – will result in an action based solely on contract. W. Page Keeton, et al., PROSSER AND KEETON ON THE LAW OF TORTS, 1, at 92 (5th ed. 1984). However, once a person starts to perform the promise and fails to complete it or does so negligently, the action may lie in tort. Id. This represents misfeasance – a defective performance. Id. For example, a physician that undertakes a surgical procedure, but does it negligently, will also be held liable in tort for failure

[11] GW makes no effort to try to reconcile its argument that no enforceable contract exists with this claim that the existence of a contract bars all tort claims.

to render service with reasonable care, despite the fact that the parties may have a contractual relationship. Id. In the instant case, the University suspended John Doe after performing or engaging in the process of investigating his accuser's claims, and conducting his disciplinary hearing – and John Doe's injury results from George Washington's deviation from reasonable care in conducting these activities.

The injury that John Doe has suffered in this context is a tort, since the injury has impaired his status and relationship as a member of the institution. This injury is personal, not contractual – John Doe's lawsuit "does not merely [seek to] recover for the loss of expected benefits, but also [seeks to recover] for injury to his reputation." Chafee, THE INTERNAL AFFAIRS OF ASSOCIATIONS NOT FOR PROFIT, 43 Harv. L. Rev. 993, 1003-04 (1930). *See also* Shook, THE TIME IS NOW: ARGUMENTS FOR THE EXPANSION OF RIGHTS FOR PRIVATE UNIVERSITY STUDENTS IN ACADEMIC DISCIPLINARY HEARINGS, 24 L. & Psych Rev. 77 (2000).

GW had a duty to provide John Doe with a fair process once it engaged in an activity that could adversely affect his status at the school. And the negligence in George Washington's investigation and handling of John Doe's case, once undertaken, is readily apparent. Crucial physical evidence – including contemporaneous emails – was never secured or presented to the Hearing Board.[12] Key witnesses, including several who saw Jane Roe that night, and one who was just four feet away from the sexual intercourse, were never even interviewed.

George Washington's negligent performance and attitude in investigating this case are, in fact, plainly revealed in Assistant Director Emerald L. Christopher's Declaration recently

---

[12] Jane Roe also verbally claimed that there was blood in her underwear after the incident, but no such physical evidence was ever secured, despite Jane Roe's claim that she had made a report to GW campus police on Saturday, the day after the incident, shortly after learning that John Doe had told a friend about their sex. She declined to name John Doe at that time. Despite this police report and counseling that Jane Doe received, no rape kit test was ever performed on Jane Doe. Jane Roe stated that she did not seek any medical attention of any kind until she went to the University clinic the following Tuesday.

submitted by GW. Ms. Christopher discusses the conversations she did have with a limited number of witnesses, but then dismisses entirely the significance of all such interviews with "people who were with her before or after the alleged assault," by stating that "[b]ut none of them said that they witnessed it." See Christopher Declaration at ¶ 9. See also id. at ¶ 10 (noting that she interviewed some of John Doe's roommates, "[b]ut, none of those individuals said that saw the alleged assault." [sic]).

This remarkably narrow view of the investigatory process – that a witness' statements are always irrelevant unless the witness was a direct eyewitness, is bizarre. In legal parlance, it equates to the skewed notion that an evidentiary "wall" is never made of "bricks," and that only walls presented intact have any relevance, with all other investigation unnecessary. And this comment is not being made by some low-level investigator. As Ms. Christopher's Declaration explains, she is the "primary case manager for incidents involving sexual assault" at GW, and is in charge of "coordinat[ing] and supervis[ing] training for GW's Sexual Assault Crisis Consultation Team on University Judicial procedures." Id. at ¶¶ 2 & 4.[13]

Ms. Christopher's stated view that only individuals who "saw the alleged assault" have pertinent information represents a fundamental misunderstanding of what is involved in an investigation, and directly and proximately caused John Doe injury before his Hearing Board. Under GW's Student Code, a person who has sex after drinking alcohol is not automatically deemed incapable of consent. Rather, any "degree of impairment" is merely something that "may be introduced as pertinent information" at a disciplinary hearing; it is not automatically dispositive. While silence or lack of protest do not "necessarily" constitute consent, these factors may evince consent "depending on the particular circumstances."

---

13 Ms. Christopher, the supposedly neutral investigator for both John Doe and Jane Roe, has acknowledged in her Declaration that she also serves on GW's Sexual Assault Task Force, and as a trainer for GW's Sexual Assault Crisis Consultation Team.

Because of Ms. Christopher's negligent investigation, these all-important "circumstances" were never placed before the Hearing Board. The key issue before that Board in this case was never whether Jane Roe and John Doe had sex, but rather whether the complainant was so intoxicated as to be incapable of consenting. The Hearing Board, hearing only from Jane Roe and John Doe, found that she was not capable of consenting – this was the foundational crux of its decision, and was specifically stated in the Board's Findings of Fact. Yet six other people besides John Doe had seen Jane Roe during this same time frame shortly before the sexual intercourse, and all six have now stated – under oath – that Jane Roe was not obviously intoxicated that night or incapable of consenting to sex. The Hearing Board never knew this, and never heard from any of these six witnesses on this point, either in person or via interview notes, because Ms. Christopher negligently failed to interview most of them, and negligently failed to even pose this key question to the few witnesses whom she did interview.

There is no way to reasonably construe the investigation that was performed by Ms. Christopher as anything other than negligent. Vital physical evidence was never secured. [14] Primary witnesses were never interviewed. And the most crucial question, concerning Jane Doe's capacity to consent, was never even posed to the witnesses who were interviewed. As a result – and as John Doe's appeal papers, attached as Exhibit A to the Memorandum in Support of this Motion, clearly demonstrate – the Hearing Board received a woefully incomplete and

---

[14] Ms. Christopher declares that "Doe's two roommates reported to me that they exchanged contemporaneous text messages confirming that Roe undressed herself before climbing into Doe's bed. They said that they would attempt to get the messages for me. But I never received them." Christopher Decl. ¶ 12. Even if this claim were accepted as true (and it should not be, since it conflicts with what these witnesses swore), this is simply not an acceptable approach for an investigator charged with developing relevant evidence in a serious case. First, the text messages were sent via cell phone – so Ms. Christopher could have verified that they were sent simply by asking the witnesses to access the messages on their phones in front of her while they talked. See Doe Mot. Ex. F (containing photographs of the text messages, taken on one of John Doe's roommate's cell phones). She was, apparently, uninterested in seeing the text messages. Second, in order to perform an adequate investigation, Ms. Christopher had the obligation to follow up with the roommates to collect this evidence, rather than idly sitting by waiting for known, potentially outcome-determinative evidence to walk itself in her door.

skewed presentation of the evidence. John Doe is likely to prevail on the merits of his claims of negligence, as well as negligent hiring, retention, training and supervision. Indeed, this Court should grant a preliminary injunction to make clear to GW that the basic concept of a reasonable "investigation" includes more than simply giving up once direct eyewitnesses to the ultimate event cannot be located – to prevent similar injustices from occurring in future disciplinary proceedings, including those conducted by this same "primary case manager" and "supervis[or]" who handles most or all of these cases, and who appears so completely untrained in the contours of a competent investigation.

### D. Intentional Infliction of Emotional Distress

Defendant GW also argues that John Doe's claim for intentional infliction of emotion distress "cannot succeed." Opp. Mem. at 27. Its cited cases, however, largely involve employer-employee situations, where a higher standard of proof applies. See Kerrigan v. Britches of Georgetowne, Inc., 705 A.2d 624, 628 (D.C. 1997) ("traditionally … more demanding" in that context). Outside of that atypical setting, the issue of whether a given set of facts is sufficiently outrageous to support an intentional infliction of emotional distress claim is not one that a court ordinarily should decide, unless the matter is beyond all reasonable dispute. See, e.g., Herbin v. Hoeffel, 806 A.2d 186 (D.C. 2002) ("Hoeffel urges us to decide that the alleged [act] … does not sink to an 'extreme and outrageous level' as a matter of law…. Where reasonable people could differ, however, that issue must be submitted to the jury."). See also Howard University v. Best, 484 A.2d 958, 986 (D.C. 1984) ("Actions which violate public policy may constitute outrageous conduct sufficient to state a cause of action for infliction of emotional distress."); Morton v. D.C. Housing Authority, 720 F. Supp. 2d 1, 22 (D.D.C. 2010) (denying motion to dismiss intentional infliction of emotional distress claims against Defendant Bonds and the D.C. Housing Authority,

after reiterating that "an action for intentional infliction of emotional distress can be made out even in the absence of physical injury or impact"). Here, where GW not only intentionally deprived John Doe of basic rights to which he was entitled before the Hearing Board, but also then reacted to his strong proof of his innocence on appeal not by genuinely searching for the truth or granting a new hearing at which both sides might then be fairly heard, but by allowing the same official who had made the charging decision against John Doe to then cherry-pick the three persons she wanted to decide his fate on appeal, these admitted and intentional acts qualify as sufficiently outrageous. A viable claim for intentional infliction of emotional distress against the University for the acts of its agents therefore plainly exists.

### E. Title IX and the D.C. Human Rights Act

Finally, Plaintiff John Doe alleges that GW's disciplinary policies discriminate against him on the basis of sex, by adopting a process of investigation, adjudication and appeal in which a male student accused by a female student of sexual assault faces a process so one-sided as to be virtually assured of a finding of guilt, depriving male students such as John Doe of educational opportunities on the basis of sex. Amended Verified Complaint ¶ 56. John Doe's recently-filed Amended Complaint also adds a new Count VI, asserting a claim against GW under the D.C. Human Rights Act. Id. ¶¶ 71-82.

Plaintiff has asserted a viable Title IX claim on which he is likely to succeed on the merits. See, e.g., Yusuf v. Vassar College, 35 F.3d 709 (2d Cir. 1994) (viable gender bias claims can fall into two categories: (1) plaintiff was innocent and wrongfully found to have committed an offense, and (2) selective enforcement, regardless of the student's guilt). John Doe has sufficiently presented a likelihood of success under both of these categories. See id. at 716 ("The

allegation that males invariably lose when charged with sexual harassment at Vassar provides a veritable causal connection similar to the use of statistical evidence in an employment case.").[15]

John Doe's Amended Verified Complaint also adds a claim for violation of the D.C. Human Rights Act. As noted in Martini v. Federal National Mortgage Association, 977 F.2d 464 (D.D.C. 1997), this statute has "broad remedial purposes," id. at 479, and is "designed 'to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit." Id. (quoting current D.C. Code § 2-1401.01). John Doe has established that GW's restriction of his intellectual life, and his ability to participate in all aspects of life at this educational institution, was disrupted, not based on "individual merit," but based on a flawed investigation, adjudication and appeals process that discriminated against John Doe and other male students. At a minimum, certain "facilities, services, programs and benefits" – such as the ability to be physically present during his entire disciplinary hearing, and his ability to personally cross-examine his accuser – were "den[ied], restrict[ed], abridge[ed] or condition[ed]," at least "partially," based on John Doe's sex, in violation of D.C. Code § 2-1402.41. John Doe is likely to prevail on his D.C. Human Rights Act claim, and this too supports injunctive relief – in order to preserve the status quo, even in the absence of any showing of "irreparable harm." See D.C. Code § 2-1402.16(b) (court may grant any relief it deems appropriate for a private cause of action, "including the relief provided in § 2-1403.07"); D.C. Code § 2-1403.07 (authorizing injunctive relief "to preserve the status quo **or** to prevent irreparable harm") (emphasis added).

[15] GW's citations to a variety of employment-related cases, most not even involving Title IX, are largely inapposite. Indeed, the district court opinion most discussed in GW's brief – Brzonkala v. Virginia Polytechnic & State Univ., 935 F. Supp. 772 (W.D. Va. 1996) – appears to have gone through a series of reversals and modifications on appeal, yet none of those appellate proceedings are discussed at all. See, e.g., Brzonkala v. Virginia Polytechnic & State Univ., 132 F.3d 949 (4th Cir. 1997) (reversing district court's denial of Title IX claim, before it too was later modified by the Fourth Circuit en banc).

## III. Balancing the Respective Harms Favors John Doe

Balancing the respective harms strongly favors John Doe. John Doe is now, literally, just days away from completing his Spring 2012 academic semester. By the time of the hearing in this matter, he will have completed his course work for this semester. As noted above, he would be irreparably harmed if the temporary restraining order were dissolved. Forced to repeat an academic semester that he has already paid for, both financially and (more importantly) in the hard work that has been advanced, Plaintiff John Doe would literally lose a half a year of his life if the status quo is not preserved.

On the other side, GW asserts that it will suffer "crippling" and "overwhelming" harm if the temporary restraining order is kept in place, Opp. Mem. at 29-30 – but then never explains exactly what this "sky is falling" scenario might be. GW does not claim that John Doe has failed to comply with a "stay away" order that has been in place almost six months. It does not allege that John Doe has committed any disciplinary offenses of any kind during this same period. And it does not explain how GW has been "crippl[ed]," or even harmed in any way at all, during the nearly two weeks that this Court's Temporary Restraining Order has now remained in effect.

At bottom, all George Washington can ultimately point to, in an effort to try to claim harm, is the University's generalized "interest in protecting the integrity of their published academic standards and disciplinary regulations" generally. Opp. Mem. at 30 (quoting Bleiker v. Board of Trustees, 485 F. Supp. 1381, 1389 (S.D. Ohio 1980)). But in truth, the integrity of those published disciplinary regulations will best be protected and promoted by a decision of this Court that supports their adherence, rather than one that condones GW's stated position that its listed regulations can be modified in any way, at any time, even in secret, and that no enforceable disciplinary rules and regulations actually exist at all.

On balance, the equities favor keeping the status quo in place until the merits of this case are heard. Where a university, as here, can point to nothing more than alleged generalized harm, the equities weigh heavily in favor of the affected student who seeks the fair process promised:

> All of this would matter less if the student did have so much at stake, far more so in any individual case than does the school. In a student body of many thousands, the dismissal of any one student, through academic failure or wrongdoing, is a trivial event. For the student, however, dismissal is painful at best, and in some instances cataclysmic.

Berger & Berger, 99 Colum. L. Rev. at 323 (emphasis added).[16]

## IV. The Public Interest Favors the Status Quo and the Promotion of Justice

Addressing the public interest, GW argues that "[c]ourts are ill-equipped to run private universities." Opp. Mem. at 30. But, of course, no one is asking this Court to run a university. Plaintiff argues, instead, that GW should simply play by its own rules, and he seeks nothing more than to enforce the contractual and other rights he is entitled to assert, with interim injunctive relief granted so that his accomplished 18-year old life is not turned upside down between now and the time when those rights can be adjudicated. The status quo was preserved for more than five months while John Doe's case was being handled within GW's system. It has now been preserved for a few weeks under this Court's Temporary Restraining Order. No good reason is apparent why it cannot similarly be preserved a while longer until this Court has had an opportunity to complete its judicial review.

The public interest will not be disserved by a preliminary injunction. Many of the cases cited by GW for its claim of a public interest by the University involve situations wholly unlike the current case, since John Doe has affirmatively presented substantial evidence verifying his

---

16 Indeed, because John Doe has already fully paid for this semester's coursework, GW would actually receive a windfall if it is allowed to keep those funds without providing John Doe with the services and grades he has earned and is contractually entitled to receive.

innocence. See, e.g., Sohmer v. Kinnard, 535 F. Supp. 53 (D. Md. 1982) (case involving a pharmacy student who had admitted and entered a guilty plea to illegally possessing cocaine); Guckenberber v. Boston Univ., 974 F. Supp. 106 (D. Mass. 1997) (unrelated class action seeking accommodations for persons with learning disabilities). The public interest is only harmed when people are punished for misconduct they did not commit.

The public interest will be enhanced by this Court enjoining GW from suspending a student based on the word of a single witness, without any physical evidence, following a flawed and incomplete investigation, and the school's failure to abide by its own procedures adopted in its Code of Student Conduct – particularly in the face of compelling evidence demonstrating John Doe's factual innocence. And at a minimum, the "public interest" will not be served by suddenly undoing the status quo that has been in place, without incident, for the past six months.

## V. No Bond Should Be Required

As John Doe has stated previously, the issue of whether this Court will require Plaintiff to post security for an injunction is a matter left to this Court's discretion. Friends for All Children v. Lockheed, 746 F.3d 816, 832 n.42 (D.C. Cir. 1984). While Plaintiff will obviously post any bond this Court requires, John Doe respectfully submits that no such security is necessary here. GW's basis for seeking a bond is based on its argument that if it prevails, the University "would have provided free educational services to Doe while the case was pending," thus allegedly "unfairly burden[ing] all other tuition-paying GW students by compelling them, in effect to subsidize Doe." Opp. Mem. at 31.

This contention is simply absurd. Plaintiff asks nothing of this University other than to continue to provide its educational services on the same financial terms and conditions that would otherwise be in place if John Doe had not been suspended. John Doe has never shirked

his financial responsibilities. He has already fully paid his tuition and fees for the current semester, and he and his family are only too aware of the substantial outlays of tuition, fees and costs, payable to GW, that will continue to apply as long as he remains at the University; it is simply wrong to suggest that John Doe has ever requested "free educational services." Given that GW will continue to receive substantial tuition and other payments in accordance with established parameters already in place, the University does not also need, in addition thereto, a separate financial bond to be posted herein, to secure the injunctive relief this Court grants. No Rule 65 bond needs to be ordered by this Court.

## CONCLUSION

For the foregoing reasons, as well as those stated in the original Memorandum in support of this Motion, a preliminary injunction should be issued.

April 29, 2011

Respectfully submitted,

__/s/_Gregory S. Smith______
Gregory S. Smith
Law Offices of Gregory S. Smith
913 East Capitol Street, S.E.
Washington, D.C. 20003
Telephone: (202) 460-3381
Facsimile: (877) 809-9113
gregsmithlaw@verizon.net

__/s/_Matthew G. Kaiser___
Matthew G. Kaiser
D.C. Bar No. 486272
The Kaiser Law Firm PLLC
910 17th Street NW, Suite 800
Washington, DC 20006
Telephone: (202) 640-2850
Facsimile: (202) 280-1034
mkaiser@thekaiserlawfirm.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Reply Memorandum was filed with the Court's CM/ECF system on this 29th Day of April, 2011 thereby causing it to be served electronically on counsel of record for this case.

_/s/________________________
Matthew G. Kaiser